**CORRECTED OPINION**

JOHN L. SOILEAU, ET AL.     *     NO. 2021-CA-0022

VERSUS     *

    **COURT OF APPEAL**

CHURCHILL DOWNS     *
LOUISIANA HORSERACING     **FOURTH CIRCUIT**
COMPANY, L.L.C.,     *
CHURCHILL DOWNS     **STATE OF LOUISIANA**
LOUISIANA VIDEO POKER     * * * * * * *
COMPANY, L.L.C., ET AL.

CONSOLIDATED WITH:         CONSOLIDATED WITH:

JOHN L. SOILEAU, ET AL.         NO. 2021-CA-0049

VERSUS

CHURCHILL DOWNS
LOUISIANA HORSERACING
COMPANY, L.L.C., CHURCHILL
DOWNS LOUISIANA VIDEO
POKER COMPANY, L.L.C., ET
AL.

CONSOLIDATED WITH:         CONSOLIDATED WITH:

JOHN SOILEAU, ET AL.         NO. 2021-CA-0199

VERSUS

CHURCHILL DOWNS
LOUISIANA HORSERACING
COMPANY, L.L.C., CHURCHILL
DOWNS LOUISIANA VIDEO
POKER COMPANY, L.L.C., ET
AL.

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2014-03873, DIVISION "G-11"
Honorable Robin M. Giarrusso, Judge
* * * * * *
**Judge Dale N. Atkins**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Tiffany Gautier Chase, Judge
Dale N. Atkins)

**LEDET, J., CONCURS**

**CHASE, J., CONCURS**

Michael David Singletary
SINGLETARY & ASSOCIATES, APLC
604 West 13th Street
Austin, TX 78701

Alan N. Magenheim, Pro Hac Vice
ATTORNEY AT LAW
3701 Kirby Drive
Suite 913
Houston, TX 77098

      COUNSEL FOR PLAINTIFFS/APPELLANTS, BERNADINE SOILEAU
      AS INDEPENDENT EXECUTRIX OF THE SUCCESSION OF JOHN
      SOILEAU, SR., ALVIN BROSSETTE, JUSTIN DEHART, DONALD
      WATSON, JOSEPH D. MANUCY AND LUCAS CONSTANTIN

Kyle Sherman
BRANDT & SHERMAN, LLP
111 Mercury Street
Lafayette, LA 70503

      COUNSEL FOR PLAINTIFFS/APPELLANTS, JOHN HAMILTON AND
      DANNY LAVERGNE

David F. Waguespack
Matthew J. Fantaci
CARVER, DARDEN, KORETZKY, TESSIER, FINN, BLOSSMAN &
AREAUX, LLC
1100 Poydras Street, Suite 3100
New Orleans, LA 70163

      COUNSEL FOR DEFENDANTS/APPELLEES, CHURCHILL DOWNS
      LOUISIANA HORSERACING COMPANY, L.L.C. AND CHURCHILL
      DOWNS LOUISIANA VIDEO POKER COMPANY, L.L.C.

John L. Duvieilh
Jennifer A. David
JONES WALKER LLP
201 St. Charles Avenue, Suite 4700
New Orleans, LA 70170

      COUNSEL FOR DEFENDANT/APPELLEE, LOUISIANA HORSEMEN'S
      BENEVOLENT AND PROTECTIVE ASSOCIATION 1993, INC.

William L. Townsend, III
Keenan K. Kelly
KELLY & TOWNSEND, LLC
137 St. Denis Street
Post Office Box 756
Natchitoches, LA 71457

J. Chris Guillet
Ronald E. Corkern, Jr.
CORKERN, CREWS & GUILLET, L.L.C.
P.O. Box 1036
Natchitoches, LA 71458-1036

COUNSEL FOR DEFENDANTS/APPELLEES, CLASS
REPRESENTATIVES, JO BAIA FOREMAN AND KENNETH L.
ROBERTS

**AFFIRMED**
**December 22, 2021**

*DNA* These three consolidated appeals arise from a class action dispute between quarter-horse owners, trainers, and jockeys; Churchill Downs Louisiana Horseracing Company, L.L.C, the owner of the Fair Grounds Race Courts & Slots Facility in New Orleans, Louisiana; Churchill Downs Louisiana Video Poker Company, L.L.C.; and the Horsemen's Benevolent and Protective Association 1993, Inc. These appeals involve the distribution of supplemental purse monies collected in quarter-horse racing at off-track facilities. Quarter-horse owners, trainers, and jockeys bring this appeal. They can be divided into two groups but will hereinafter be referred to collectively as "**Appellants**." The first group of Appellants, which is hereinafter referred to as "**Soileau Plaintiffs**," is comprised of Bernadine Soileau, as independent executrix of the Succession of John Soileau, Sr.; Alvin Brossette; Justin Dehart; Donald Watson; Joseph Manucy; and Lucas Constantin. The second group of Appellants, which is hereinafter referred to as "**Hamilton Plaintiffs**," is comprised of some of the class representatives, namely Danny Lavergne and John Hamilton.

1

**Appellees** are Jo Baia Foreman[1] and Kenneth L. Roberts; Churchill Downs Louisiana Horseracing Company, L.L.C. (hereinafter referred to as "**CDLHR**") and Churchill Downs Louisiana Video Poker Company, L.L.C. (hereinafter referred to as "**CDLVPC**") (CDLHR and CDLVPC are hereinafter collectively referred to as "**Fair Grounds Defendants**"); and the Louisiana Horsemen's Benevolent and Protective Association 1993, Inc. (hereinafter referred to as "**HBPA**").

Appellants appeal the trial court's November 12, 2020 judgment, which denied Soileau Plaintiffs' and Hamilton Plaintiffs' motions to vacate the trial court's February 18, 2020 order that preliminarily approved a proposed class action settlement agreement (hereinafter referred to as "**proposed settlement agreement**"), a class,[2] class representatives,[3] class counsel,[4] and deadlines to opt-out, object, and submit a claim form. They also appeal the trial court's decision not to reset those aforementioned class action deadlines in response to orders issued by

---

[1] In the record before this Court, "Jo Baia Foreman" is also sometimes spelled "Jo Baya Foreman." For consistency, this opinion will only use the spelling "Jo Baia Foreman."

[2] The February 18, 2020 order certified the class as:

> All persons and/or entities who are quarter[-]horse owners, quarter[-]horse trainers, and quarter[-]horse jockeys who have won or earned purses at the Fair Grounds Race Course since January 1, 2008, and who claim, claimed, and/or could claim that they are entitled under [] La. R.S. 27:438 to any portion of monies collected from video poker, or which claim, claimed, and/or could claim damages against any Defendant under any theory of recovery of any portion of the monies collected from video poker pursuant to the La. R.S. 27:438.

[3] The February 18, 2020 order appointed Mrs. Foreman, Mr. Roberts, Mr. Hamilton, and Mr. Lavergne as class representatives.

[4] The February 18, 2020 order appointed Kelly & Townsend, LLC, and Corkern, Crews, Guillet & Johnson, L.L.C. as class counsel.

2

the Louisiana Governor and the Louisiana Supreme Court regarding the COVID-19 pandemic. (**2021-CA-0022**). Further, Appellants appeal the trial court's February 18, 2020 order granting preliminary approval of the proposed settlement agreement. (**2021-CA-0049**). Finally, Appellants appeal the trial court's January 28, 2021 judgment granting final approval of the proposed settlement agreement. (**2021-CA-0199**). For the following reasons, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because these three consolidated appeals involve multiple Appellants and Appellees, we begin our summary of the factual background and procedural history with a description of the parties.[5]

### *APPELLANTS*

Appellants are Bernadine Soileau, as independent executrix of the Succession of John Soileau, Sr.; Alvin Brossette; Justin Dehart; Donald Watson; Joseph Manucy; Lucas Constantin; Danny Lavergne; and John Hamilton. Appellants are divided into two groups. The first group known as Soileau Plaintiffs is comprised of Bernadine Soileau, as independent executrix of the Succession of John Soileau, Sr.; Mr. Brossette; Mr. Dehart; Mr. Watson; Mr. Manucy; and Mr. Constantin. The second group known as Hamilton Plaintiffs is comprised of Mr. Lavergne and Mr. Hamilton. In a February 18, 2020 order, the trial court, in pertinent part, appointed Hamilton Plaintiffs as two of the four class representatives. They signed the proposed settlement agreement but now oppose it.

---

[5] Due to the complexity of this litigation and the numerous parties, we repeat some of the descriptions of the parties and add more details about the parties in this subsequent section.

## PLAINTIFFS

In the "Petition for Declaratory Judgment, Permanent Injunction, and Damages – Class Action" (hereinafter "Petition") filed on April 21, 2014, John Soileau, Sr.; Alvin Brossette; Justin Dehart; Donald Watson; Joseph Manucy; Lucas Constantin; Danny Lavergne; John Hamilton; Jo Baia Foreman; and Kenneth L. Roberts are named as plaintiffs (hereinafter collectively referred to as "**Plaintiffs**"). Therein, Plaintiffs described themselves as members of a class of "Louisiana quarter-horse owners, trainers, and jockeys" who "are 'horsemen' entitled to the payment of supplemental purses pursuant to La. R.S. 27:438" and its predecessor statutes due to underpayment of quarter-horse purses won at the Fair Grounds Race Course & Slots since 2008.[6]

## APPELLEES

Jo Baia Foreman and Kenneth L. Roberts are named plaintiffs in the Petition, as previously discussed. In the February 18, 2020 order, the trial court named them as the other two class representatives. (Though, as previously mentioned, Mr. Lavergne and Mr. Hamilton are also class representatives, the phrase "**Class Representatives**" will hereinafter collectively refer to Mrs. Foreman and Mr. Roberts only). They signed the proposed settlement agreement and continue to support it based on their testimony before the trial court.

Churchill Downs Louisiana Horseracing Company, L.L.C. (CDLHR), owns the Fair Grounds Race Course & Slots facility in New Orleans, Louisiana. It is a "licensed establishment" under the Video Draw Poker Devices Control Law. La. R.S. 27:401, et seq. Specifically, it qualifies as a licensed establishment because it

---

[6] Louisiana Revised Statutes 27:438 relates to the "[d]istribution of device revenues" in quarter-horse and thoroughbred horse racing.

4

is a "Louisiana state racing commission licensed race track [and] pari-mutuel wagering facility." La. R.S. 27:402(10).

Churchill Downs Louisiana Video Poker Company, L.L.C. (CDLVPC), is a subsidiary or related business interest of CDLHR according to Plaintiffs' Petition. It is a "device owner" under the Video Draw Poker Devices Control Law. La. R.S. 27:401, et seq. Specifically, it qualifies as a device owner because it "owns and operates . . . video draw poker devices in licensed establishments[,]" including at the CDLHR-owned Fair Grounds Race Course & Slots facility and at off-track waging facilities. La. R.S. 27:402(5).

The Louisiana Horsemen's Benevolent and Protective Association 1993, Inc. (HBPA), is "designated and recognized as an authorized representative that shall represent member and other horsemen racing at licensed race meetings held in the state of Louisiana for the purpose of but not limited to negotiating contracts for such horsemen with all racing associations licensed by the state of Louisiana, relative to purses . . . and all other matters of interest and concern to such horsemen." La. R.S. 4:179.1.

As noted previously, this matter consists of three consolidated appeals that are the result of protracted class action litigation that has come before this Court on multiple occasions. In *Soileau v. Churchill Downs Louisiana Horseracing Co., L.L.C.*, 2017-1003, 2017-1004, pp.1-2 (La. App. 4 Cir. 6/13/18), 317 So.3d 491, 493-94, *writ denied*, 2018-1349 (La. 11/14/18), 256 So.3d 283, this Court observed:

> This lawsuit constitutes complicated and protracted litigation involving a dispute in the horse racing industry between ... [quarter-horsemen] and Churchill Downs Louisiana Horseracing Company, LLC, owner of the Fair Grounds Race

5

Course & Slots facility in New Orleans, and Churchill Downs Louisiana Video Poker Company, LLC.

. . . .

*Soileau, et al. v. Churchill Downs Louisiana Horse Racing Co., LLC, et al.*, 17-0264, slip op. at pp. 1-2 (La. App. 4 Cir. 8/23/2017) (unpub.).

The quarter-horsemen, Mr. Soileau, Mr. Brossette, Mr. Dehart, Mr. Hamilton, Mr. Lavergne, Mr. Watson, Mr. Munacy, and Mr. Constantin, Mrs. Foreman, and Mr. Roberts (collectively, "Plaintiffs") instituted the litigation by filing a "Petition for Declaratory Judgment, Permanent Injunction, and Damages - Class Action" on April 21, 2014.[7] The Petition averred that Plaintiffs were owners, trainers, and jockeys of quarter-horses racing at the Fair Grounds and were entitled to payment of supplemental purse money pursuant to La. R.S. 27:438.[8] *Soileau*,

---

[7] Note that this Court is utilizing "Plaintiffs" when necessary to refer to all plaintiffs named in the Petition. In the instant appeal, however, Plaintiffs disagree on the proposed settlement at issue herein. That is, at this stage of the proceedings, some named Plaintiffs appear as Appellants, and other named Plaintiffs appear as Appellees.

[8] Louisiana Revised Statutes 27:438 is titled "Distribution of device revenues; particular licensed establishments; pari-mutuel wagering facilities." During the relevant time frame, La. R.S. 27:438 provided in pertinent part:

> A. The owner of the licensed establishment shall pay twenty percent of the net device revenue derived from the operation of devices at the licensed establishment to be used to supplement purses for horsemen as provided in subsection B of this Section. Such monies shall be made available for use as purses monthly, prior to the twentieth day of the month following the month in which they are earned.
>
> B. Revenues earned or purse supplements under subsection A shall be disbursed, accounted for, and used as follows:
>
>> 1. Monies earned for purse supplements from devices located at a racing facility currently conducting live racing shall be in addition to all other monies currently provided for purses and purse supplements under other provisions of law and shall be used at the current race meeting.

6

2017-1003, p.5, 317 So.3d at 496. Louisiana Revised Statutes 27:438 requires a percentage of video poker net device revenue from off-track facilities to be set aside to supplement the purses issued to the top finishers in horse races.

The April 21, 2014 Petition further contended that Fair Grounds Defendants disbursed the video poker revenue in favor of the owners of thoroughbred horses in violation of La. R.S. 27:438. The Petition claimed that Plaintiffs were entitled to the revenue from the end of the thoroughbred racing in March through the last day of quarter-horse racing in September, which constitutes approximately half of the revenue set aside for purses.

By law, quarter-horse racing totals ten days in a fifty-two week period. In comparison, thoroughbred racing compromises at least eighty days. *See* La. R.S. 4:214.1(B). It is undisputed that all of the video poker revenue supplemented the purses of the thoroughbred races. Fair Grounds Defendants did not retain possession of the video poker revenues, rather, they sent the money to HBPA, and HBPA distributed the money to thoroughbred races. *See* La. R.S. 4:179.1 and 4:185. The parties further agreed the disputed video poker funds totaled $35,820,731.00.

By their First Amended Petition filed on August 14, 2014, Plaintiffs added HBPA as a defendant. Therein they described HBPA as "organized, in part, to foster, protect, represent, and promote the welfare and common interest of

---

2. Monies earned for purse supplements from devices located at a racing facility not currently conducting live racing shall be placed in an interest-bearing account until the first day of the next live race meeting conducted at that facility, at which time the accumulated monies derived from this Paragraph shall be added to all other monies currently provided for purses and purse supplements at that race meeting under other provisions of the law and shall be used at that race meeting.

7

thoroughbred and quarter[-]horse owners and trainers to improve conditions in the horse racing industry and to improve the relationships between horsemen." They further explained that "[m]embership in HBPA is open to those persons who are licensed owners and/or trainers of thoroughbred and/or quarter[-]racehorses meeting the minimum requirements established by the bylaws of HBPA and approved for membership by its board of directors." Additionally, Plaintiffs noted in the First Amended Petition that they have all been members of HBPA since at least 2008 and that, upon information and belief, all members of the class are members of HBPA. Plaintiffs alleged in the First Amended Petition that "[t]o the extent that HBPA represented or purported to represent quarter[-]horsemen in negotiating purses allowing the payment of all La. R.S. 27:438 purse[] supplements to thoroughbred horsemen, then HBPA breached its statutory duty to represent the quarter[-]horsemen in good faith." HBPA receives the purse funds from the various racetracks in Louisiana and distributes winnings to the owners, trainers, and jockeys.

In response to the Petition, Fair Grounds Defendants filed an exception of primary jurisdiction, arguing that the trial court should transfer the matter to the Louisiana Racing Commission ("Commission"). The trial court agreed and transferred the matter to the Commission on December 2, 2014 because the Commission has regulatory and adjudicatory authority over all aspects of horseracing, which is a highly regulated industry. *Soileau*, unpub., 2017-0264, p.2.[9]

---

[9] This Court denied Plaintiffs' application for supervisory writs seeking review of the judgment granting the exception of primary jurisdiction. *Soileau v. Churchill Downs Louisiana Horse Racing Co., L.L.C.,* unpub., 2014-1398, p.1 (La. App. 4 Cir. 1/26/15).

Thereafter, this matter proceeded before the Commission, with the parties seeking review of several issues in the district court, as well as in this Court. Fair Grounds Defendants and HBPA filed exceptions of no right of action before the Commission. On August 24, 2015, the Commission granted the exceptions. Thereafter, on September 18, 2015, Plaintiffs filed a petition to appeal that administrative ruling of the Commission. The trial court heard the appeal and affirmed the Commission's ruling. On December 18, 2016, Plaintiffs filed a notice of appeal to this Court, and this Court remanded the matter for procedural corrections to the judgment, with which the trial court complied in an amended judgment dated September 15, 2017.[10] On October 31, 2017, Plaintiffs filed a motion for devolutive appeal from the amended judgment, which the trial court granted on November 6, 2017. On June 13, 2018, this Court rendered judgment in favor of Plaintiffs, concluding that they did have a right of action to proceed against Fair Grounds Defendants and HBPA. *See Soileau*, 2017-1003, p. 9, 317 So.3d at 498.

On February 28, 2019, Fair Grounds Defendants formally requested that the Commission set their previously-filed exception of nonjoinder for a hearing. The hearing occurred on June 24, 2019, and the Commission ultimately denied the exception. On July 24, 2019, Fair Grounds Defendants filed an appeal of this ruling.

---

[10] The amended judgment states, in pertinent part: "The Court hereby amends the Judgment dated September 5, 2016 for typographical errors. The Court inadvertently omitted defendant Churchill Downs Louisiana Horseracing Company, LLC. Additionally, the date of the Judgment rendered incorrectly listed the year as 2016."

On or about July 2, 2019, Fair Grounds Defendants advised Plaintiffs that all persons seeking a horse stall for the 2019 Quarter Horse Meet at the Fair Grounds would be required to execute a Stall Agreement that waived their claims in the lawsuit (hereinafter referred to as "**2019 Stall Agreement**"). On July 3, 2019, Plaintiffs filed a rule to show cause, in which they asked the Commission to set a hearing to enjoin Fair Grounds Defendants from requiring execution of the waiver in the 2019 Stall Agreement. They also asked the Commission to declare the waiver to be unenforceable. On July 22, 2019, the Commission held a hearing on the matter and ordered the waiver language to be stricken from the 2019 Stall Agreement. That same day, Fair Grounds Defendants filed a petition with another division of the trial court to reverse this ruling. They received a temporary restraining order, which temporarily prohibited the enforcement of the Commission's July 22, 2019 order.

On August 2, 2019, Plaintiffs and Fair Grounds Defendants jointly obtained an order from the trial court to stay the pending appeals of the two above-discussed matters, i.e., Fair Grounds Defendants' appeal of the nonjoinder issue and of the 2019 Stall Agreement issue, pending further settlement discussions.

On September 13, 2019, Plaintiffs, Fair Grounds Defendants, and HBPA met to discuss a potential settlement. On October 25, 2019, class counsel met with Plaintiffs to review the terms of the proposed settlement agreement. Soileau Plaintiffs objected to the proposed settlement agreement. Class counsel withdrew from representing Soileau Plaintiffs, and the trial court eventually signed an order enrolling new counsel for Soileau Plaintiffs on February 18, 2020.[11] Class counsel

---

[11] On February 18, 2020, the trial court signed an order enrolling Singletary & Associates, APLC, as counsel for Soileau Plaintiffs.

continued to represent those Plaintiffs who supported the proposed settlement agreement, namely Mrs. Foreman, Mr. Roberts, Mr. Lavergne, and Mr. Hamilton. The trial court eventually named them as representatives of the class in a February 18, 2020 order, and they ultimately executed the proposed settlement agreement.

On January 23, 2020, all enrolled counsel[12] filed a "Joint Motion to Set Court Dates for Class Certification and Related Relief," and the trial court ordered a hearing to be held on February 18, 2020. On February 14, 2020, all enrolled counsel[13] filed a "Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Related Relief." In pertinent part, the proposed settlement agreement provided:

1) Quarter-horse races would receive 12.5% of the video poker purse proceeds at the Fair Grounds, up to a maximum of $1,000,000.00 per year;

2) $1,000,000.00 would be designated for the payment of "past due" claims (from 2008 through the present); the settlement of past due

---

[12] This occurred prior to class counsel, Kelly & Townsend, LLC, and Corkern, Crews & Guillet, L.L.C., withdrawing from their representation of Soileau Plaintiffs and prior to the trial court enrolling new counsel for the Soileau Plaintiffs. Accordingly, Kelly & Townsend, LLC, and Corkern, Crews, and Guillet filed the motion on behalf of Soileau Plaintiffs and Mrs. Foreman, Mr. Roberts, Mr. Lavergne, and Mr. Hamilton. Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux LLC filed the motion for Fair Grounds Defendants. Jones Walker, LLP, filed the motion for HBPA.

[13] Again, this occurred prior to class counsel, Kelly & Townsend, LLC, and Corkern, Crews & Guillet, L.L.C., withdrawing from their representation of Soileau Plaintiffs and prior to the trial court enrolling new counsel for the Soileau Plaintiffs. Accordingly, Kelly & Townsend, LLC, and Corkern, Crews, and Guillet filed the motion on behalf of Soileau Plaintiffs and Mrs. Foreman, Mr. Roberts, Mr. Lavergne, and Mr. Hamilton. Carver, Darden, Koretzky, Tessier, Finn, Blossman & Areaux LLC filed the motion for Fair Grounds Defendants. Jones Walker, LLP, filed the motion for HBPA.

claims would be funded by 25% of the $1,000,000.00 video purse proceeds for the first four years, with the other 75% of video poker purse proceeds going to current races for purse supplements;

3) The Fair Grounds would add five extra race days for quarter-horses;

4) Quarter-horse races would receive 30% of the video poker proceeds at other Louisiana race tracks besides the Fair Grounds; and

5) The Fair Grounds would not enforce waivers contained in the 2019 Stall Agreement or in any other prospective stall agreement.

Notably, the proposed settlement agreement contemplated the Louisiana Legislature amending current law to reflect this agreement.[14]

On February 18, 2020, Soileau Plaintiffs filed an opposition to the "Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Related Relief." In the opposition, counsel for Soileau Plaintiffs requested additional time to respond to the "Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Related Relief." Soileau Plaintiffs also filed a motion to substitute counsel.

On the same day that Soileau Plaintiffs filed their opposition, February 18, 2020, the trial court held a hearing on the "Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Related Relief." After the hearing, the trial court executed an order granting the "Joint Motion for Preliminary Approval of Class Action Settlement Agreement." The order certified the proposed class of quarter-horse owners, trainers, and jockeys who won purses at the Fair Grounds Race Course from January 1, 2008, and who claimed or could claim

---

[14] By 2020 La. Acts No. 342, §2, the Louisiana Legislature passed the required amendment. Nonetheless, the amendment is contingent on a final judgment being rendered in this case.

entitlement to supplement purse funds from video poker revenue. The trial court named Mrs. Foreman, Mr. Roberts, Mr. Hamilton, and Mr. Lavergne, as representatives of the class. The trial court ordered opt-out forms to be received by the HBPA by April 13, 2020; objection forms to be received by the clerk of court by April 3, 2020; and claim forms to be received by the HBPA by August 1, 2020. The trial court set a fairness hearing for April 27, 2020. According to counsel for Fair Grounds Defendants, all counsel received a copy of the February 18, 2020 order in open court. The notice of judgment for this order is dated November 12, 2020.

On April 3, 2020, Soileau Plaintiffs filed a "Motion for Clarification, or in the Alternative, Motion for Continuance." In their motion, Soileau Plaintiffs noted that Louisiana Governor John Bel Edwards issued proclamations and that the Louisiana Supreme Court issued orders that extended certain legal deadlines in response to the COVID-19 pandemic. In light of this, Soileau Plaintiffs requested that the trial court clarify all pending deadlines for the class, including those for opting out, objecting, and the submission of claims forms, i.e. to clarify whether those deadlines were affected by the Governor's proclamations and the Louisiana Supreme Court's orders. Alternatively, Soileau Plaintiffs requested a continuance of all deadlines "in order to maintain the same notice and evaluation periods between deadlines that were originally contemplated in establishing the Order." Considering Soileau Plaintiffs' motion, the trial court ordered the parties to participate in a telephone status conference on June 16, 2020. After the telephone conference, on June 18, 2020, the trial court issued a scheduling order, which provided:

1. The hearing on any dispositive motions or exceptions to the Second Amended Petition of Certain Plaintiffs for Damages is set for July 20, 2020 at 9:00 am. Dispositive motions and/or exceptions to be heard on this date must be filed by July 6, 2020 and any objections thereto filed by July 13, 2020. Churchill Downs Louisiana Horseracing Commission [sic] Company, LLC, Churchill Downs Louisiana Video Poker Company, LLC and Horsemen's Benevolent and Protective Association have agreed to waive service of the Second Amended Petition.

2. The Fairness Hearing that had been scheduled for April 27, 2020 pursuant to this Court's Order dated February 18, 2020 is reset to October 7-9, 2020 at 9:00 am.

Though the scheduling order reset the fairness hearing from April 27, 2020, to October 7-9, 2020, it did not continue the other deadlines, such as the deadline to opt-out, object, or submit a claim. Soileau Plaintiffs did not seek review of the trial court's failure to clarify the deadlines to opt-out, object, or submit claim forms, nor the trial court's failure to grant the continuance in the alternative.

On May 28, 2020, Soileau Plaintiffs filed a Second Amended Petition. In the Second Amended Petition, Soileau Plaintiffs essentially requested that the trial court appoint them as class representatives and allow them to continue litigating the merits. The Second Amended Petition identified an identical class and set forth identical claims and damages. In response to the Second Amended Petition, HBPA and Fair Grounds Defendants separately filed exceptions of lack of procedural capacity, prematurity, and *lis pendens*, as well as a motion to strike. Soileau Plaintiffs filed an opposition to those exceptions, and Fair Grounds Defendants filed a reply in support of the exceptions. On July 22, 2020, the trial court granted the exceptions and dismissed the Second Amended Petition filed by Soileau Plaintiffs. Soileau Plaintiffs filed an application for supervisory writs regarding the July 22, 2020 judgment that dismissed their Second Amended

14

Petition. On September 16, 2020, this Court denied the writ application "as the trial court did not err."

On September 18, 2020, Soileau Plaintiffs filed a motion to vacate the February 18, 2020 order. On September 22, 2020, Hamilton Plaintiffs also filed a motion to vacate the trial court's February 18, 2020 order. Though Hamilton Plaintiffs initially agreed to the proposed settlement agreement, signed the proposed settlement agreement, and were named by the trial court as representatives of the class, they eventually objected to the proposed settlement agreement. The trial court held a hearing on the motions to vacate on October 7, 2020, and ultimately denied the motions to vacate on November 12, 2020.

Prior to the fairness hearing scheduled for October 7-9, 2020, Fair Grounds Defendants filed a brief in support of final approval of the proposed settlement agreement on September 21, 2020. Fair Grounds Defendants attached numerous exhibits to their brief and asserted that the factors outlined in La. C.C.P. art. 591 were met for class certification. Further, Fair Grounds Defendants contended the proposed settlement agreement was fair, reasonable, and adequate according to *Reed v. General Motors Corporation*, 703 F.2d 170 (5th Cir. 1983).

Also on September 21, 2020, Soileau Plaintiffs and Hamilton Plaintiffs filed an "Objection to Fairness Hearing and Subject to that Objection Opposition to the Entry of Final Judgment on the Proposed Settlement." They objected to the trial court holding a fairness hearing by asserting that the Governor's Proclamations and the Supreme Court's orders issued as a result of the COVID-19 pandemic required the trial court to issue new deadlines to opt-out, object, or submit a claim form. They also objected to the court holding a fairness hearing by claiming that the February 18, 2020 order was null due to a lack of service and contended that the

15

class notice was defective. Alternatively, Soileau Plaintiffs and Hamilton Plaintiffs argued the proposed settlement agreement was not fair, reasonable, or adequate.

On September 22, 2020, class counsel filed a memorandum in support of the proposed settlement agreement on behalf of Class Representatives. Class counsel provided a background of the litigation and the numerous issues presented to the Commission, the trial court, and this Court. In support of the fairness of the proposed settlement agreement, class counsel indicated the parties fought numerous exceptions before the Commission, the trial court, and this Court and agreed to stay two issues while engaging in settlement negotiations, namely the issues of nonjoinder and the enforceability of the Fair Grounds' 2019 Stall Agreement waivers. Further, class counsel noted the outcome of those two issues could affect the litigation. Class counsel outlined why they believed the proposed settlement agreement was fair, reasonable, and adequate. On September 22, 2020, HBPA filed a memorandum in support of the proposed settlement agreement by adopting the memorandum filed by class counsel.

Fair Grounds Defendants filed a reply to Soileau Plaintiffs' objection to the fairness hearing and opposition to the proposed settlement agreement. Fair Grounds Defendants submitted that if Soileau Plaintiffs truly believed in their claim, they would have opted out of the settlement and continued the litigation. Fair Grounds Defendants noted that, instead, Soileau Plaintiffs objected to the proposed settlement agreement.

*FAIRNESS HEARING ON OCTOBER 7, 2020, AND NOVEMBER 17, 2020*

The trial court conducted a fairness hearing on October 7, 2020, and November 17, 2020. During the fairness hearing, the trial court received both documentary and testimonial evidence.

**APPELLEES' CASE IN CHIEF**

**Documentary Evidence Presented by Appellees**

At the fairness hearing, Appellees introduced numerous exhibits into evidence. The exhibits numbered one through thirty-three and numbered forty-one through sixty-one included, in pertinent part, both completed and incomplete opt-in forms (also referred to as claim forms); both completed and incomplete opt-out forms; completed objection forms; and claim value calculations.[15]

---

[15] The exhibits introduced into evidence include:

1.  Exhibit #1: Completed Opt-In Forms (also referred to as claim forms)

2.  Exhibit #2: Incomplete Opt-In Forms

3.  Exhibit #3: Completed Objection Forms

4.  Exhibit #4: Completed Opt-Out Forms

5.  Exhibit #5: Incomplete Opt-Out Forms

6.  Exhibit #6: Objector Claim Value Calculation, Brossette, Alvin, Owner

7.  Exhibit #7: Objector Claim Value Calculation, Brossette, Alvin, Trainer

8.  Exhibit #8: Objector Claim Value Calculation, Dehart, Justin, Owner

9.  Exhibit #9: Objector Claim Value Calculation, Dehart, Justin, Trainer

17

10. Exhibit #10: Objector Claim Value Calculation, Connie Nobles and Guillory Bros., LLC (Lyle and Carl Guillory), Owner

11. Exhibit #11: Objector Claim Value Calculation, JLS Speed Horse Ranch Inc. (John Soileau), Owner

12. Exhibit #12: Objector Claim Value Calculation, M&D Racing Stables (Norris Davis & Levi Mays), Owner

13. Exhibit #13: Objector Claim Value Calculation, Manucy, Carly C., Owner

14. Exhibit #14: Objector Claim Value Calculation, Manucy, Joseph D., Trainer

15. Exhibit #15: Objector Claim Value Calculation, N V Racing (Norris Davis), Owner

16. Exhibit #16: Objector Claim Value Calculation, Watson, Donald R., Jockey

17. Exhibit #17: Objector Claim Value Calculation, Williams, Darrell, Owner

18. Exhibit #18: Incomplete Opt-Out Claim Value, Carter, III, James C., Owner

19. Exhibit #19: Incomplete Opt-Out Claim Value, Dugas, Carl, Owner

20. Exhibit #20: Completed Opt-Out Claim Value, Demouchet, Ricky Joseph, Trainer

21. Exhibit #21: Completed Opt-In Claim Value (Total for class)

22. Exhibit #22: No Form Objector Claim Value Calculation, Hamilton, John E., Jockey

23. Exhibit #23: No Form Objector Claim Value Calculation, Lavergne, Danny, Jockey

24. Exhibit #24: February 18, 2020 Mailing: Notice of Class Settlement

25. Exhibit #25: February and September 2020: Claimant Members Mailing List

26. Exhibit #26: February 27, 2020 Mailing Transaction Receipt

27. Exhibit #27: February 28, 2020 Mele Printing Invoice

28. Exhibit #28: Non-deliverable Returned Mail Envelopes (3)

29. Exhibit #29: August 2020 Mailing: Class Action Notice Regarding Date Change of #Fairness Hearing from April 27, 2020, to October 7, 2020

30. Exhibit #30: September 4, 2020 Mailing Transaction Receipt

31. Exhibit #31: September 4, 2020 Mele Printing Invoice

32. Exhibit #32: September 28, 2020 Administrator's (HBPA's) Report by Edwin J. Fenasci

33. Exhibit #33: Administrator's (HBPA's) Master Return Mail Log

(Please note that the subsequent exhibits numbered 34 through 40 are not included in this list because they were proffered but not admitted.)

41. Exhibit #41: Fair Grounds 2019 Stall Application

42. Exhibit #42: 2015 Condition Book Exemplar

43. Exhibit #43: February 18, 2020 Order, which preliminarily approved a class settlement, a class, class representatives, class counsel, and deadlines to opt-out, object, and submit a claim form

44. Exhibit #44: February 14, 2020 Joint Motion for Preliminary Approval of Class Action Settlement

45. Exhibit #45: Spreadsheets: Reports of 20% of Video Poker Net Device Revenue for 2008 - 2019 (in globo)

46. Exhibit #46: July 2, 2014 Letter to Louisiana Racing Commission from Counsel for Fair Grounds and Excerpts of Commission's October 21, 2014 Meeting (in globo)

47. Exhibit #47: August 13, 2018 Letter to Louisiana Racing Commission from Counsel for Fair Grounds and Excerpts of Commission's August 28, 2018 Meeting (in globo)

48. Exhibit #48: May 23, 2019 Letter to Louisiana Racing Commission from Counsel for Fair Grounds and Excerpts of Commission's June 19, 2019 Meeting (in globo)

49. Exhibit #49: August 20, 2020 Letter to Louisiana Racing Commission from Counsel for Fair Grounds

50. Exhibit #50: February 21, 2020 Minutes of a Special Meeting of the Board of Directors of the Louisiana Quarter Horse Breeders Association (LQHBA)

51. Exhibit #51: March 1, 2020 LQHBA Memorandum to Members

52. Exhibit #52: August 12, 2013 LQHBA Letter to Jeff Traylor, Audit Director, Louisiana State Police, Gaming Audit Section

53. Exhibit #53: November 26, 2013 LQHBA Letter to Tim Bryant, President, Fair Grounds

54. Exhibit #54: January 9, 2014 LQHBA letter to Stanley Seelig, HBPA

**Testimonial Evidence Presented by Appellees**

**Testimony of Ryan Robicheaux**

Ryan Robicheaux testified he is the current President of LQHBA and the owner of a quarter-horse breeding farm, including quarter-horses that race. Mr. Robicheaux testified he had been in the quarter-horse business for thirty-one years. He indicated he accepted the purse amount listed in the condition book prior to racing horses at the Fair Grounds between 2008 and 2019. Additionally, Mr.

55. Exhibit #55: October 12, 2018 LQHBA letter to Charles Gardiner, III, Executive Director, Commission

56. Exhibit #56: CDLHR Responses to Request for Admissions

57. Exhibit #57: CDLHR Responses to Interrogatories and Request for Production

58. Exhibit #58: CDLVPC Responses to Request for Admissions, Interrogatories, and Request for Production

59. Exhibit #59: HBPA Responses to Request for Admissions, Interrogatories, and Request for Production

60. Exhibit #60: Affidavit of Mr. Guillet (one of the attorneys who serves as class counsel). As of November 17, 2020, Mr. Guillet worked 1,020 hours providing legal services in this matter and paid approximately $11,597.78 for costs.

61. Exhibit #61: Affidavit of Mr. Townsend (one of the attorneys who serves as class counsel). As of November 17, 2020, Mr. Townsend worked 653 hours providing legal services in this matter and paid approximately $22,070.62 for costs.

Robicheaux testified that he understood the terms of the proposed settlement agreement and supported the proposed settlement agreement. Mr. Robicheaux claimed the addition of the supplemental 12.5% of video poker purse money would be very beneficial to quarter-horse breeding and racing in Louisiana. Further, he asserted the quarter horse-purses would increase by forty to fifty percent. During cross-examination, Mr. Robicheaux admitted he did not file a claim or opt-in to the proposed settlement agreement. Mr. Robicheaux noted he was aware that the disputed video poker funds totaled thirty-five million dollars.

**Testimony of Edwin Joseph Fenasci**

Edwin Joseph Fenasci, the current executive director of the HBPA, testified he worked in the racing industry for a total of thirty-eight years. He indicated HBPA is the appointed administrator in this case. Mr. Fenasci testified that the Louisiana Legislature tasked HBPA with handling the payout of purses from the four racetracks to the winners of all races (owners typically receive 80% of the purse, trainers 10%, and jockeys 10%). Further, he explained HBPA issues checks to the owners, trainers, and jockeys and thus maintains addresses. Mr. Fenasci identified Exhibit #25, a list of owners, trainers, and jockeys, along with their addresses, who won races at the Fair Grounds between 2008 and 2019. He noted that 3,567 notices of the proposed settlement agreement were mailed to the class on February 27, 2020, utilizing the information from Exhibit #25. Mr. Fenasci indicated that the United States Postal Service (hereinafter referred to as "USPS") returned four notices as undeliverable[16]; that HBPA received 179 completed claim

---

[16] Note that Mr. Fenasci testified that USPS returned four notices as undeliverable; but in the record before this Court, Exhibit #28 contains only three notices returned as undeliverable.

or opt-in forms; that HBPA received thirty-three incomplete claim or opt-in forms; and that HBPA received one complete opt-out form and two incomplete opt-out forms. Additionally, Mr. Fenasci noted the clerk of court received ten completed objection forms. As requested, Mr. Fenasci testified he performed various calculations. He calculated the value of the claim of the member who completed an opt-out form totaled $12,968.49. He further determined the value of the claims of the members submitting incomplete opt-out forms totaled $2,931.36. Mr. Fenasci also calculated the value of the claims of the members who submitted completed claim or opt-in forms totaled $4,610,062.00.

Mr. Fenasci determined the total value of the claims of the ten members objecting to the proposed settlement agreement as follows:[17]

    a)  Mr. Brossette: $43,730.91.[18]

    b)  Mr. Dehart: $29,804.93.[19]

    c)  Lyle Guillory: $92,875.00.[20]

    d)  JLS Speed Horses (Mr. Soileau): $58,698.52.[21]

---

[17] The total value of the claims of the ten members objecting to the proposed settlement agreement is $518,544.96.

[18] Per Exhibit #6 (claim value for Mr. Brossette as an owner, $6,965.83) and Exhibit #7 (claim value for Mr. Brossette as a trainer, $36,765.08).

[19] Per Exhibit #8 (claim value for Mr. Dehart as an owner, $2,840.64) and Exhibit #9 (claim value for Mr. Dehart as a trainer, $26,964.29).

[20] Per Exhibit #10 (claim for Lyle and Carl Guillory, Guillory Bros., $0; claim for Dwayne J. Saucier and Lyle Guillory, $807.41; claim for Lyle Guillory, $66,562.97; claim for Lyle Guillory and Teddy Abrams, $22,922.22; claim for Lyle Guillory and John Soileau, $0; and Lyle Guillory, Teddy Abrams, Lou Phillips, and Darryl Williams, $2,582.40).

[21] Per Exhibit #11 (Objector Claim Value Calculation, JLS Speed Horse Ranch Inc. (John Soileau), Owner).

e) M&D Racing Stables: $66,370.48.[22]

f) Carly Munacy: $0.00.[23]

g) Joseph Munacy: $34,916.03.[24]

h) NV Racing: $16,697.52.[25]

i) Donald R. Watson: $124,912.63.[26]

j) Darryl Williams: $51,538.94.[27]

Mr. Fenasci noted Mr. Hamilton, one of the class representatives who initially supported and signed the proposed settlement agreement, did not submit an objection form. Mr. Fenasci indicated that he was asked to calculate the value of Mr. Hamilton's claim and determined the value was $363,414.46. Additionally, Mr. Fenasci explained that Mr. Lavergne, one of the other class representatives who initially supported and signed the proposed settlement agreement, did not submit an objection form. Mr. Fenasci explained that he was asked to calculate the value of Mr. Lavergne's claim, which he determined to be $113,377.56.

Mr. Fenasci identified the condition book for 2015, which the trial court admitted as Exhibit #42. Mr. Fenasci testified a condition book provides a road map for trainers so they know the requirements of the race, such as the age and/or

---

[22] Per Exhibit #12 (Objector Claim Value Calculation, M&D Racing Stables (Norris Davis & Levi Mays), Owner).

[23] Per Exhibit #13 (Objector Claim Value Calculation, Manucy, Carly C., Owner).

[24] Per Exhibit #14 (Objector Claim Value Calculation, Manucy, Joseph D., Trainer).

[25] Per Exhibit #15 (Objector Claim Value Calculation, N V Racing (Norris Davis), Owner).

[26] Per Exhibit #16 (Objector Claim Value Calculation, Watson, Donald R., Jockey).

[27] Per Exhibit #17 (Objector Claim Value Calculation, Williams, Darrell, Owner).

weight requirement for a horse to be eligible for participation, as well as the amount of the purse for that race and the source of the funds for the purse. He stated HBPA reviews the condition books before the track issues it and works with each track to insure they offer the races indicated therein. Further, Mr. Fenasci indicated that the Commission approves the condition book prior to issuance.

Mr. Fenasci testified he attends Commission meetings in his capacity as executive director of HBPA. Mr. Fenasci stated he attended meetings wherein the Commission instructed the Fair Grounds to place the disputed video poker funds into the thoroughbred races.

Mr. Fenasci testified that Exhibit #1 comprises all of the properly completed and timely submitted opt-in forms (also referred to as claim forms). He recalled classifying the claim form from Mrs. Foreman, one of the class representatives who approved the proposed settlement agreement, as timely. Mr. Fenasci indicated he checked every claim form carefully as they arrived and as the deadline to submit a claim neared, he checked the postmark to determine if a claim arrived timely. Mrs. Foreman's claim form indicates she signed it on August 1, 2020, and HBPA received it on August 7, 2020. HBPA designated several claim forms received after August 1, 2020, as timely.

The notice advised the class "**THE CLAIM FORM MUST BE SUBMITTED (MAILED/POSTMARKED) NO LATER THAN AUGUST 1, 2020.**" (Emphasis in original). In reviewing exhibit one, this Court notes Mrs. Foreman's claim form indicates she signed it on August 1, 2020, and the HBPA received it on August 7, 2020. Mr. Fenasci designated her claim form filed timely. Exhibit #1 reveals HBPA designated several claim forms received after August 1, 2020, as timely. For instance, Anthony Arey submitted a claim form signed on

July 30, 2020, and it was received by HBPA on August 6, 2020. Frank Cavazos submitted a claim form signed June 6, 2020, and it was received by HBPA on August 7, 2020. Andrea G. Lematta submitted a claim form signed July 28, 2020, and it was received by HBPA on August 6, 2020. Daisy Sanchez submitted a claim form signed August 1, 2020, and it was received by HBPA on August 5, 2020. Noe R. Sanchez submitted a claim form signed August 1, 2020, and it was received by HBPA on August 5, 2020. HBPA designated the claim forms timely.

Mr. Fenasci noted Mr. Roberts, one of the class representatives who approved the proposed settlement agreement, did not submit an individual claim form. However, Mr. Fenasci indicated Mr. Roberts is a partner/owner with other entities and that HBPA received claim forms on behalf of Mr. Roberts and Jumonville Farms, as well as JD&C Jumonville and Mr. Roberts.

On cross-examination, Mr. Fenasci noted Mr. Jumonville signed the claim forms, not Mr. Roberts. On re-direct, Mr. Fenasci indicated HBPA received several claim forms for multi-owner accounts signed by a single owner.

Also on cross-examination, Mr. Fenasci agreed Evangeline Downs distributes video poker proceeds to both quarter-horse and thoroughbred races, but noted the other tracks do not have poker machines. Mr. Fenasci testified he believed Evangeline Downs had quarter horse races in 1991 when the Louisiana Legislature passed the video poker statute, La. R.S. 27:438. He noted the Fair Grounds did not have set quarter horse races in 1991 except for Champion's Day, when there might be a few quarter horse races on that particular day.

**Testimony of Bruce Salaid**

Bruce Salaid, the executive director of LQHBA, testified he had an understanding of the proposed settlement agreement and was present when

26

LQHBA passed a resolution supporting the proposed settlement agreement. He noted that on March 1, 2020, LQHBA issued a detailed letter to their members urging their 1,700 plus members to support the settlement. At the beginning and the end of the March 1, 2020 letter, LQHBA urged its members "*****PLEASE DO NOT OPT OUT OF SETTLEMENT*****." In addition to the capitalization and red ink, LQHBA enlarged the font to distinguish the plea from the rest of the memorandum. Mr. Salaid indicated LQHBA raised the issue of video poker purse supplements beginning in 2013 and was very aware of the situation. Beginning in 2013, LQHBA sent letters to the State Police, the President of the Fair Grounds, HBPA, and the Commission claiming quarter-horsemen were entitled to a portion of the video poker proceeds from Fair Grounds Defendants. Mr. Salaid affirmed that LQHBA's vote in support of the proposed settlement agreement was not a knee jerk reaction.

Mr. Salaid indicated he has owned and raced quarter-horses since 1980-1981. He stated that he personally looked forward to the additional purse money and additional race days, believing both were significant, especially after the COVID-19 pandemic.

During cross-examination, Mr. Salaid acknowledged LQHBA knew the amount of the disputed purse funds totaled thirty-five million dollars. Mr. Salaid indicated LQHBA possessed a general idea of the attorneys' fees included with the proposed settlement agreement. Further, Mr. Salaid noted LQHBA knew the proposed settlement agreement allowed the Fair Grounds to seek to move the quarter-horse races to another track, but noted the proposed settlement agreement provided the video poker supplemental purse money would transfer from the Fair Grounds to the receiving track.

Mr. Salaid acknowledged he was eligible to file a claim as an owner but that he had not filed a claim.

**Testimony of Kenneth Roberts**

Kenneth Roberts, who is a class representative, testified he is an owner and trainer of quarter-horses. Mr. Roberts indicated he understood the terms of the proposed settlement agreement. Further, Mr. Roberts stated he discussed the multi-owner claim with Mr. Jumonville and knew Mr. Jumonville was filing it. Mr. Roberts noted he intended to submit an individual claim form, though he was not sure if he did so. He acknowledged he would not participate in the million dollars for past claims in an individual capacity. Mr. Roberts indicated he still supported the proposed settlement agreement because it was not about him but about helping all horsemen. Mr. Roberts acknowledged it was alleged that thirty-five million dollars was owed for past claims, but he expressed a desire to move forward and believed the proposed settlement agreement was in the best interest of the quarter-horse racing industry. Finally, Mr. Roberts indicated he attended proceedings before the Commission and the district court and was aware Plaintiffs won some battles and lost some battles.

**Testimony of Jo Baia Foreman**

Jo Baia Foreman, a class representative, testified she owns quarter-horses. Mrs. Foreman expressed she understood the terms of the proposed settlement agreement. She indicated that she believed the proposed settlement agreement was the best solution for horsemen because she wants horseracing to continue in Louisiana. The trial court questioned Mrs. Foreman about her enthusiasm for the additional five days of racing at the Fair Grounds. Mrs. Foreman indicated that she has to pay a trainer to take her horse(s) to a track. Mrs. Foreman explained with

additional race days over several weeks, a horse could run twice, making it easier to justify the costs of getting the horse to the track. Mrs. Foreman indicated she attended many of the Commission meetings and was aware Plaintiffs won some battles and lost some battles during the litigation. She acknowledged the disputed past due claims are alleged to total just over thirty-five million dollars. However, Mrs. Foreman testified she supported the proposed settlement agreement because it provides certainty for the quarter-horse industry.

Mrs. Foreman noted she executed a claim form on August 1, 2020, at the office of class counsel. She watched class counsel leave with her claim form in an envelope to deposit it in the mail. Mrs. Foreman stated that if HBPA denied her claim, she would still support the proposed settlement agreement because it was in the best interest of Louisiana horsemen.

During cross-examination, Mrs. Foreman explained she lost her claim form and went to the office of class counsel to obtain another one. Mrs. Foreman indicated she never believed the class would receive the thirty-five million dollars and thought, instead, that they were fighting for the future of quarter-horse racing at the Fair Grounds.

**Testimony of Jason Boulet**

Jason Boulet indicated he is the senior director of racing at the Fair Grounds. Mr. Boulet testified that during the first one hundred and seventeen years of racing at the Fair Grounds, only thoroughbred horses raced there. Mr. Boulet indicated that, in 2008, the Louisiana Legislature added five quarter-horse race days and later increased the number of quarter-horse race days to ten. He noted the minimum number of thoroughbred race days is eighty. Mr. Boulet explained the

sources of purse funds are slots, video poker, and pari-mutuel wagering, or funds from individuals betting on the race.

Mr. Boulet acknowledged that he attends Commission meetings and possessed personal knowledge of the Commission ordering the Fair Grounds to place disputed video poker funds into thoroughbred races. Further, he confirmed that the Fair Grounds paid purses pursuant to the Commission's directive. Mr. Boulet acknowledged that the Fair Grounds sought the Commission's direction in 2014 when Plaintiffs raised the issue because the video poker statute differs from the slot machine law. He noted the slot machine law specifically mandates seventy percent of revenue be paid to thoroughbred races and thirty percent of revenue be paid to quarter-horse races.

Mr. Boulet explained that a condition book informs trainers and owners of the type of race and purse offered by the Fair Grounds.

Mr. Boulet noted the first five horses to finish a race are entitled to purse funds. He explained that he never received a complaint about the purses paid to any quarter-horse owner, trainer, or jockey prior to the filing of suit.

Mr. Boulet read the following waiver from the 2019 Fair Grounds Stall Agreement:

> Applicant does not have any claims against Fair Grounds and to the extent Applicant has any such claims, Applicant knowingly and voluntarily releases any such claims, including but not limited to any and all claims set forth in that certain suit John L. Soileau et al v. Churchill Downs Louisiana Horseracing Company, L.L.C. et al, filed as case no. 14-3873, Div. G, in the Civil District Court for the Parish of Orleans, State of Louisiana, and now pending with the Louisiana Racing Commission.

Mr. Boulet testified approximately 550 - 600 horses were stabled in 2019 during quarter horse racing days at the Fair Grounds. He stated that all trainers and/or

30

owners of the 550 - 600 horses executed the 2019 Stall Agreement containing the waiver. Mr. Boulet explained that Fair Grounds Defendants intended to utilize the stall application containing the waiver in the future.

On cross-examination, Mr. Boulet asserted his belief that applying La. R.S. 27:438 as suggested by Appellants would devastate the thoroughbred industry. He indicated such an application would result in the quarter-horse races receiving five and a half months of video poker purse supplemental funds for ten days of racing, doubling the purses of quarter-horse races, and removing significant funds from thoroughbred races. Further, Mr. Boulet contended the public interest in quarter-horse races is not at the same level as that of thoroughbred races. He testified that for every $100.00 placed in bets on races, less than $1.00 is placed on a quarter-horse race. Mr. Boulet asserted there is no real fan base because owners and their guests are the individuals attending quarter-horse races.

**Testimony of Arthur Morrell**

Arthur Morrell, who is Clerk of Criminal District Court for Orleans Parish, testified he previously served in the Louisiana Legislature. Mr. Morrell indicated he served in the Louisiana Legislature from 1984 through 2006 and authored, or co-authored, 99% of the horse bills passed during his tenure. He acknowledged he was a member of the Louisiana Legislature at the time of the passage of the bill regarding video poker purse supplements. In particular, Mr. Morrell indicated the bill came about after he purchased a horse farm and was approached by other horsemen who asked how the horse industry could be protected. Mr. Morrell testified that he "devised a couple of bills", including the video poker purse supplement bill to keep the thoroughbred industry in existence by not allowing video poker machines at a racetrack unless some of the proceeds supplemented the

31

purses. Mr. Morrell noted the Fair Grounds did not conduct quarter-horse races at the time of the bill's passage. Mr. Morrell indicated the intent of La. R.S. 27:438, which is titled "Distribution of device revenues; particular licensed establishments; pari-mutuel wagering facilities", was to increase purses for thoroughbred races. Mr. Morrell explained that the video poker money generated by the enactment of the bill was for the meets in existence at the time of the creation of the bill. He noted that at the time of the passage of the bill the Fair Grounds only conducted thoroughbred horse races. Mr. Morrell noted a portion of the funds did go to the quarter-horse breeders' award and that race received video poker funds, but quarter-horse races did not receive video poker funds.

**APPELLANTS' CASE IN CHIEF**

**Testimonial Evidence Presented by Appellants**

**Testimony of Danny Lavergne**

Appellants called Danny Lavergne, who was a jockey from 1976 through 2016 when he retired. Mr. Lavergne testified that he won approximately 100 races at the Fair Grounds. He explained that he raced at the Fair Grounds between 2008 and 2016. Mr. Lavergne indicated some of the jockeys and trainers learned that the Fair Grounds Defendants withheld money that should have gone to quarter-horse races and placed the money into thoroughbred races. He recalled meeting once with a lawyer at the racetrack, but believed he had not spoken to a lawyer since. Mr. Lavergne did not know the names of the attorneys representing him previously and testified that he did not know he was a class representative. When asked about the proposed settlement agreement, Mr. Lavergne noted he got something in the mail and that Mr. Roberts suggested Mr. Lavergne should sign it, so he did. Further, Mr. Lavergne explained that he used to ride for Mr. Roberts and

believed Mr. Roberts had his best interests at heart. Mr. Lavergne admitted he did not read all of the proposed settlement agreement or ask a lawyer to review it, though he should have. He explained that he was now opposed to the proposed settlement agreement because he learned that the amount alleged to be owed was thirty-five million dollars. Additionally, Mr. Lavergne stated he spoke with Mr. Hamilton and Mr. Watson about the amount alleged to be owed and learned it was thirty-five million dollars. Mr. Lavergne indicated "[a]ll I want is what they said that they were supposed to do and so, what's owed to me."

During cross-examination, Mr. Lavergne noted his signature appeared on the proposed settlement agreement. He agreed he did not opt-out of the settlement and did not file an objection to the proposed settlement agreement. Mr. Lavergne stated his problem with the proposed settlement agreement is that he would only get $250.00, according to his lawyer, Mr. Brandt, who represented him as of the day of the hearing. Mr. Lavergne did not know the value of his claim totaled $113,377.56. He recalled one or two meetings with Mr. Townsend (one of the attorneys who serves as class counsel) talking to a group that included Mr. Lavergne, Mr. Roberts, Mr. Hamilton, and Mr. Watson. However, Mr. Lavergne did not recall participating in a telephone meeting to discuss the terms of the proposed settlement agreement.

**Testimony of Donald Watson**

Donald Watson, a jockey, testified he won quite a few races at the Fair Grounds. He testified when he won races at Evangeline Downs, Louisiana Downs, or Delta Downs, they would pay from video poker and slot machine revenue. Later, Mr. Watson indicated he did not know whether Louisiana Downs and Delta Downs included video poker revenue with their purse funds. Mr. Watson testified

33

that for what it cost him to come to New Orleans to race, it was not fair to be cheated out of his money. He noted that he missed weddings, funerals, and vacations being a jockey. Mr. Watson stated he wanted to continue the litigation.

On cross-examination, Mr. Watson acknowledged additional racing days would be beneficial. Mr. Watson admitted he attended a meeting with an attorney at Evangeline Downs, another in Baton Rouge, and one Shreveport. Mr. Watson declared his objection to the proposed settlement agreement was that it was not fair to keep the money he worked for and that was supposed to be distributed by the Fair Grounds. He agreed the value of his claim totaled $124,912.63. Mr. Watson testified he was not told had he submitted a claim he would have received approximately $25,000.00.

**Testimony of Joseph Munacy**

Joseph Munacy, a horse trainer, testified he trained horses that ran at the Fair Grounds. He testified he did not like the million dollar settlement because he believed they should receive the money owed to them. Accordingly, Mr. Munacy expressed a desire to continue the litigation.

During cross-examination, Mr. Munacy acknowledged he participated in several group meetings and that he had the opportunity throughout the litigation to discuss the case. Mr. Munacy testified he did not like the cap portion of the proposed settlement agreement. He noted he always believed the Fair Grounds should have more days of quarter-horse races. Further, Mr. Munacy stated that when he raced at the Fair Grounds between 2008 and 2014, he did not complain about the amount of the purses. Mr. Munacy indicated he reviewed the condition book for the purse amount and would see the source of the purse funds. He acknowledged his claim totaled $34,916.03. When informed that people were

receiving approximately twenty cents on the dollar if they submitted a claim form, Mr. Munacy testified more money should be in the settlement and "I think I should be entitled to what's mine."

**Testimony of Alvin Brossette**

Alvin Brossette, who was a jockey for thirty-eight years, testified he owned and trained quarter-horses for the last seven or eight years. He indicated by the time the Fair Grounds held quarter-horse meets in 2008, he trained horses that ran. Mr. Brossette noted after learning the Fair Grounds did not pay video poker proceeds to the quarter-horse industry, he instituted suit on behalf of the quarter-horse industry. Mr. Brossette testified he did not like the proposed settlement agreement because one million dollars for past claims was not enough when, according to his interpretation, the amount due was thirty-five million dollars. He advised he did not like the yearly amount being capped at one million dollars. Further, Mr. Brossette insisted he was not worried about what he might get individually but was fighting for the whole industry.

During cross-examination, Mr. Brossette acknowledged receiving a condition book prior to a race that revealed the purse and the sources of funds for the purse. Mr. Brossette agreed he decided whether or not to enter a horse in a race based on the condition book and did not complain about the purse amount until 2014. On re-direct examination, he testified he learned of the terms of the proposed settlement agreement prior to October 2019 and participated in several settlement meetings. Mr. Brossette stated he knew the amount in dispute totaled thirty-five million dollars. Additionally, he indicated he had the opportunity to discuss the proposed settlement agreement with others. Mr. Brosette noted after the terms of

35

the proposed settlement agreement were revealed, some were in favor of the proposed settlement agreement and some were against it.

**REBUTTAL BY APPELLEES**

**Jo Baia Foreman Rebuttal Testimony**

Appellees recalled Mrs. Foreman. Mrs. Foreman testified she participated in several meetings pertaining to the proposed settlement agreement. She indicated that in October 2019, she, Mr. Roberts, and Mr. Brossette attended a meeting in person with class counsel while Mr. Lavergne, Mr. Hamilton, and Mr. Munacy participated by telephone. Mrs. Foreman noted after the meeting, some were in favor of the proposed settlement agreement and some were against it. She also indicated she knew the amount in dispute potentially totaled thirty-five million dollars. Mrs. Foreman acknowledged that all Plaintiffs discussed the proposed settlement agreement amongst themselves to determine whether they supported it or not.

*POST-FAIRNESS HEARING BRIEFS*

The trial court granted the parties until December 18, 2020, to submit post-trial briefs. On December 18, 2020, Soileau Plaintiffs and Hamilton Plaintiffs submitted a "Post Hearing Brief in Support of Opposition to the Entry of Final Judgment on the Proposed Settlement [Agreement]." Also on December 18, 2020, Fair Grounds Defendants filed a "Post Trial Memorandum in Support of Final Approval of Class Action Settlement." Mrs. Foreman and Mr. Roberts, as class representatives, submitted a "Post-Hearing Memorandum in Support of Settlement" on December 18, 2020. Pursuant to the trial court's request, Mrs. Foreman and Mr. Roberts, in their capacity as Class Representatives, also filed a document titled "Proposed Findings of Fact and Relevant Procedural History."

36

HBPA filed a "Motion and Incorporated Memorandum in Support to Join and Adopt the Post-Hearing Memorandum in Support of Settlement and Proposed Findings of Fact and Law," i.e., to adopt the Post-Hearing Memorandum and Proposed Findings of Fact filed by Class Representatives, Mrs. Foreman and Mr. Roberts. Thereafter, on December 28, 2020, Soileau Plaintiffs and Hamilton Plaintiffs filed an objection to the "Motion for Final Approval of the Settlement Agreement," which was filed by Class Representatives, Mrs. Foreman and Mr. Roberts; Fairgrounds Defendants; and HBPA.

***TRIAL COURT JUDGMENT AND REASONS FOR JUDGMENT***

On January 28, 2021, the trial court issued a final judgment, which granted final approval to the proposed settlement agreement, the class, the class representatives, the amount of the settlement, the payout procedure, and $787,500.00 as reasonable attorneys' fees and reimbursement of expenses for class counsel. In the trial court's written reasons for judgment, the trial court acknowledged the proposed settlement agreement was not perfect because no settlement is perfect. The trial court believed the proposed settlement agreement was in the best interests of all. The trial court indicated the need to add the thoroughbred defendants would lead to additional, years-long litigation at a considerable expense to all. Further, the trial court indicated it was not impressed with the testimony of the objectors.

Appellants now seek review of the January 28, 2021 judgment, as well as the trial court's November 12, 2020 denial of the Soileau Plaintiffs' and Hamilton Plaintiffs' motions to vacate; failure to reset deadlines in light of the Governor's Proclamations and the Supreme Court's Orders in response to the COVID-19

37

pandemic; and February 18, 2020 grant of the joint motion for preliminary approval of the proposed settlement agreement.

For purposes of this Opinion, we will consider each consolidated appeal separately.

## DISCUSSION

### 2021-CA-0022: Appeal of the Trial Court's Denial of the Motions to Vacate

In this appeal, Appellants seek review of the trial court's denial of their motions to vacate.[28] The appellants assign three errors:

[1]. The Trial Court erred in denying the [] Motion[s] to Vacate.

[2]. The Trial Court erred in not resetting the deadlines as required by the Governor's Proclamations and Supreme Court's Orders in response to COVID-19.

3. The Class Notice is Defective.[29]

Each of these assignments of error is discussed in turn.

### Jurisdiction of Moot Issue

Prior to addressing the merits, we note that in this consolidated appeal Appellants seek review of the judgment, which denied their motions to vacate the judgment granting preliminary approval to the proposed settlement agreement and the judgment granting final approval of the proposed settlement agreement. In

---

[28] Note that in their first assignment of error, Appellants state that "[t]he Trial Court erred in denying the Soileau Plaintiffs' Motion to Vacate." Soileau Plaintiffs filed their Motion to Vacate on September 18, 2020, and Hamilton Plaintiffs filed their Motion to Vacate on September 22, 2020. Though the assignment of error references only Soileau Plaintiffs' motion, we consider the trial court's denial of both motions in this section.

[29] Appellants did not assign as error the argument regarding the class notice being defective. Appellants' brief to this Court includes it as a major heading and designated the argument as number three. Appellees likewise designated their response as number three. For consistency, the Court will utilize the numbering of the parties.

2021-CA-0199, Fair Grounds Defendants contend that any objection to the judgment granting preliminary approval is moot because the trial court held a fairness hearing on the merits of the proposed settlement agreement and thereafter granted final approval to the proposed settlement agreement.

In *Edward v. Badie*, in discussing whether an issue was moot, this Court indicated:

> The Louisiana Supreme Court provided that "[t]he jurisprudence of this Court is well settled that courts will not decide abstract, hypothetical or moot controversies, or render advisory opinions with respect to such controversies." *Cat's Meow, Inc. v. City of New Orleans Through Dep't of Fin.*, 98-0601, p.8 (La. 10/20/98), 720 So. 2d 1186, 1193. Further,
>
>> an issue is "moot" when a judgment or decree on that issue has been "deprived of practical significance" or "made abstract or purely academic." *Perschall v. State*, 96-0322 (La. 7/1/97), 697 So.2d 240; *Louisiana Associated Gen. Contractors, Inc.[v. State Through Div. of Admin., Office of State Purchasing]*, 669 So.2d [1185] at 1193 [ (1996) ]; *American Waste & Pollution Control Co. [v. St. Martin Parish Police Jury]*, 627 So.2d [158] at 162 [ (1993) ]. A case is "moot" when a rendered judgment or decree can serve no useful purpose and give no practical relief or effect. *Robin [v. Concerned Citizens for Better Ed. in St. Bernard, Inc.]*, 384 So.2d [405] at 405 [(1980)]. If the case is moot, then "'there is no subject matter on which the judgment of the court can operate.'" *St. Charles Parish Sch. Bd. [v. GAF Corp.]*, 512 So.2d [1165] at 1171 [ (1987) ] (*citing Ex parte Baez*, 177 U.S. 378, 20 S.Ct. 673, 44 L.Ed. 813 (1900)). That is, jurisdiction, once established, may abate if the case becomes moot. *Id*.

2019-0332, p. 2 (La. App. 4 Cir. 8/28/19), 282 So.3d 269, 270-71.

In the case *sub judice*, an argument exists that any claim pertaining to the judgment granting preliminary approval is moot because the trial court issued a final judgment approving the settlement. Similarly, any objection to the order granting preliminary approval to the class and the proposed settlement agreement

ceased to exist upon rendition of the final judgment. The joint motion for preliminary approval served as a procedural vehicle to obtain court approval of the notice to be disseminated to the class. The notice issued to the class informed the class of the terms of the proposed settlement agreement; their opportunity to opt-out, object, or opt-in; and the date of the fairness hearing. The final judgment approving the class and the proposed settlement agreement occurred after the issuance of the notice and the opportunity to present testimony and evidence at the fairness hearing. A decision by this Court pertaining to the order granting preliminary approval would be deprived of practical significance because there is a final judgment granting approval of the class and the proposed settlement agreement.

We note the appeals appeared in a unique procedural posture because appellate courts typically review an objection to an order granting preliminary approval prior to the fairness hearing. *See, e.g., Pollard v. Alpha Tech.*, 2010-0788, p. 53 (La. App. 4 Cir. 8/12/11), 102 So.3d 71, 106 (wherein this Court reversed the trial court's judgment granting preliminary approval of a class settlement prior to the trial court holding a fairness hearing). Herein, Appellants sought review of the order granting preliminary approval in such close proximity to the request to review the final judgment that this Court consolidated the appeals.

Nonetheless, appeals are favored by law. *Alexander v. La. State Bd. of Private Investigator Exam'rs*, 2019-0778, p. 20 (La. App. 4 Cir. 4/1/20), 293 So.3d 1243, 1256, *writ denied*, 2020-01072 (La. 11/10/20), 303 So.3d 1039. Further, an appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him when taking an unrestricted appeal from a final judgment. *Elysian, Inc. v. Neal Auction Co.*, 2020-0674, p. 9 (La. App. 4 Cir. 7/21/21), 325 So.3d. 1075,

40

1083. Thus, we consider the assignments of error pertaining to the preliminary order and do not deem them moot.

**Jurisdiction to Consider the November 12, 2020 Judgment**

Prior to addressing the merits of Appellants' argument, the Court notes that Fair Grounds Defendants and Class Representatives assert the November 12, 2020 judgment denying the motions to vacate is interlocutory and not appealable. "A judgment that does not determine the merits but only preliminary matters in the course of the action is an interlocutory judgment. A judgment that determines the merits in whole or in part is a final judgment." La. C.C.P. art. 1841. Notably, "an interlocutory judgment is appealable only when expressly provided by law." La. C.C.P. art. 2083(C). In this instance, the November 12, 2020 judgment denying the motions to vacate determined preliminary matters and not the merits. Further, there is no law that expressly provides the right to appeal the denial of a motion to vacate. Thus, the proper procedural vehicle to seek review of an interlocutory judgment is by the filing of an application for supervisory writs. *Sullivan v. Malta Park*, 2016-0875, p. 4 (La. App. 4 Cir. 1/31/17), 215 So.3d 705, 708; *see also Narcise v. Jo Ellen Smith Hosp.*, 98-2417, p. 4 (La. App. 4 Cir. 3/10/99), 729 So.2d 748, 751 (wherein this Court noted the plaintiffs filed an application for supervisory writs asking this Court to consider the merits of the trial court's denial of a motion to vacate).

Nonetheless, while an interlocutory judgment may not itself be immediately appealable, it is nevertheless subject to review by an appellate court when an appealable judgment is rendered in the case. *Elysian, Inc.,* 2020-0674, p. 9, 325 So.3d. at 1083 (citing *People of the Living God v. Chantilly Corp.*, 251 La. 943, 947-48, 207 So.2d 752, 753 (1968)). "When an unrestricted appeal is taken from a

41

final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment." *Id.* (quoting *Wimsatt v. City of New Orleans*, 2019-0461, p. 7, n. 6 (La. App. 4 Cir. 12/20/19), 286 So.3d 1217, 1223).

Appellants were not entitled to appellate review of the November 12, 2020 judgment denying the motions to vacate at the time of the lodging of the appeal in this Court on January 15, 2021, because the judgment was interlocutory. On January 28, 2021, the trial court rendered a final judgment in this matter. Appellants sought an unrestricted appeal of the final judgment, and this Court ordered consolidation of the appeals.[30] Thus, this Court will review the interlocutory judgment, which denied the motions to vacate, as part of the unrestricted appeal of the final judgment rendered on January 28, 2021.

## STANDARD OF REVIEW

Appellate courts review the denial of a motion to vacate under an abuse of discretion standard. *Narcise*, 98-2417, p.9, 729 So.2d at 753.

### *Assignment of Error No. 1 – Denial of the Motions to Vacate*

The motions to vacate requested that the trial court vacate the February 18, 2020 order granting preliminary approval of the settlement agreement. Appellants set forth several arguments to support the assertion that the trial court erred in denying the motions to vacate.

---

[30] The Court consolidated the cases after the parties filed separate briefs in 2021-CA-0022 and 2021-CA-0049. The parties thereafter filed separate briefs in 2021-CA-0199. There is some overlap in the assignments of error and/or arguments in support thereof. The Court will address the issues raised in the various appeals separately while omitting detailed discussion of the similar assignments and/or arguments.

### *Applicability of La. C.C.P. art. 2002*

Appellants first contend the preliminary order is null pursuant to La. C.C.P. art. 2002(A)(2). That provision states:

> A final judgment shall be annulled if it is rendered against a defendant who has not been served with process as required by law and who has not waived objection to jurisdiction, or against whom a valid final default judgment has not been taken.

Appellants aver that Appellees failed to serve them with a copy of the "Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Related Relief." Thus, Appellants contend the February 18, 2020 preliminary order is null.

In their Appellee brief, Fair Grounds Defendants first contend the specific articles governing class actions do not require a contradictory hearing to approve a preliminary settlement. Fair Grounds Defendants aver La. C.C.P. art. 594, which pertains to "[d]ismissal or compromise" of a class action, requires the court to hold a fairness hearing after notice of the proposed settlement has been provided to the class. In support, Fair Grounds Defendants cite *Pollard*. Therein, this Court acknowledged that pursuant to La. C.C.P. art. 594(B), a formal hearing is not required until after preliminary approval and notice of the compromise has been provided to the class. *Pollard*, 2010-0788, p. 5, 102 So.3d at 76. Fair Grounds Defendants further cite Kent A. Lambert, *Class Action Settlements in Louisiana*, 61 LA. L. REV. 89, 125 (2000) (noting preliminary approval of a settlement is often granted with no formal hearing, even at the federal level). Fair Grounds Defendants also aver La. C.C.P. art. 2002 is not applicable. They note that the February 18, 2020 order granting preliminary approval of the settlement is not a final judgment.

Similarly, Class Representatives note that Appellants received notice of the February 18, 2020 hearing in a letter dated January 29, 2020, and sent via Federal Express. Class Representatives aver that Appellants obtained new counsel; new counsel appeared at the February 18, 2020 hearing; new counsel argued against granting preliminary approval of the settlement; and new counsel did not object to a lack of service during the February 18, 2020 hearing.

We agree the February 18, 2020 order determined preliminary matters and not the merits. Hence, the February 18, 2020 order is interlocutory. Louisiana Code of Civil Procedure Article 2002 applies to final judgments. Thus, Appellants' contention that La. C.C.P. art. 2002 applies is misplaced.

Additionally, La. C.C.P. art. 2002 provides that a final judgment shall be annulled if rendered "[a]gainst a defendant who has not been served with process as required by law and who has not waived objection to jurisdiction." La. C.C.P. art. 2002(A)(2). In *Washington v. Landry's Seafood House New Orleans, Inc.*, the plaintiff claimed the defendant did not properly serve him with a motion. 2014-0128, p. 4, n. 4 (La. App. 4 Cir. 11/19/14), 154 So.3d 677, 680. This Court determined that the objection to service was voluntarily waived because the plaintiff made a general appearance and argued the merits of the motion. *Id.*

Two Appellants, Mr. Watson and Mr. Brossette, appeared at the February 18, 2020 hearing with counsel. Counsel for Appellants argued the merits of the motion. At no point did counsel for Appellants object due to a lack of service. Rather, counsel for Appellants first requested additional time to prepare for the fairness hearing. Next, counsel for Appellants indicated that he would require two days to present evidence at the fairness hearing. Appellants voluntarily waived the right to object to a lack of service when they made a general appearance, argued

44

the merits, and did not object to a lack of service. *See Washington*, 2014-0128, p. 4, n. 4, 154 So.3d at 680. This argument lacks merit.

### *Applicability of La. C.C.P. art. 1312*

Appellants next cite La. C.C.P. art. 1312, which states that "every pleading subsequent to the original petition shall be served on the adverse party as provided by [La. C.C.P. arts.] 1313 or 1314." Appellants aver that class counsel, Fair Grounds Defendants, and HBPA filed a joint motion for preliminary approval of class settlement. Appellants submit that Appellees did not request service on Appellants, an adverse party. Appellants contend that Appellees failed to comply with La. C.C.P. art. 1312.

In their briefs, Appellees again note counsel for Appellants appeared on February 18, 2020, and argued the merits of the motion. Appellees contend that counsel for Appellants did not object due to a lack of service. Thus, Appellees conclude that Appellants waived the right to object to a lack of service.

As indicated above, Appellants and their counsel appeared at the February 18, 2020 hearing and did not object to a lack of service. Rather, counsel for Appellants argued the merits and participated fully in the hearing. Thus, Appellants voluntarily waived the right to object to a lack of service when they made a general appearance, argued the merits, and did not object to a lack of service. *See Washington*, 2014-0128, p. 4, n. 4, 154 So.3d at 680. This argument lacks merit.

### *Applicability of La. C.C.P. art. 963*

Appellants further cite La. C.C.P. art. 963, which is titled "Ex parte and contradictory motions; rule to show cause." Louisiana code of Civil Procedure Article 963 provides, in pertinent part, that "[i]f the order applied for by written

45

motion is one to which the mover is not clearly entitled, or which requires supporting proof, the motion shall be served on and tried contradictorily with the adverse party." Appellants suggest that Appellees, as the movers, were not clearly entitled to the relief sought in the joint motion. Appellants contend that Appellees were required to serve the adverse parties and try the motion contradictorily. Appellants aver that they were not served with the joint motion and that the trial court should have thus vacated the February 18, 2020 order.

In their briefs, Appellees again note counsel for Appellants appeared on February 18, 2020, and argued the merits of the motion. Appellees contend counsel for Appellants did not object due to a lack of service. Thus, Appellees conclude that Appellants waived the right to object to a lack of service.

This Court has acknowledged that a formal hearing is not required until after preliminary approval and notice of the settlement has been sent to the class. In *Pollard*, this Court quoted from the trial court's reasons for judgment as follows:

> The two-step approach for approval of a settlement class is laid out in *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 438-439 (E.D. Pa. 2008); *Armstrong v. B. Of School Dirs.*, 616 F.2d 305, 314 (7th Cir. 1980), overruled on other grounds by *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F.Supp. 1379, 1384 (D.Md. 1983); *Horton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 855 F.Supp. 825, 827 (E.D. N.C. 1994).
>
> First, the Court issues a preliminary approval of the settlement, where the court reviews the proposed settlement for obvious deficiencies, schedules a fairness hearing, and provides the class with notice of the proposed settlement and hearing. Second, the court considers the final approval of the proposed settlement at a formal fairness hearing during which arguments and evidence are presented in support of and in opposition to the proposed settlement.
>
> *On a motion for preliminary approval the Court need only ascertain whether there is "probable cause" to notify the class members of the proposed settlement and to proceed with a fairness hearing. Mid-Atlantic Toyota*, 564 F.Supp. at 1384. When making the preliminary determination of fairness of the settlement, the standard is

> not whether the settlement was the best of all possible deals, but rather, "whether it is fair, adequate, and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (96 Cir, 1988) [(9 Cir.1998)]. When a proposed settlement appears to fall within the range of possible approval, it is appropriate to issue preliminary approval and direct notice to members of the settlement class. *Horton*, 855 F.Supp. [825] at 827.

*Pollard*, 2010-0788, pp. 4-5, 102 So.3d at 75-76.

In this instance, the trial court complied with the two-step approach. The trial court reviewed the proposed settlement agreement, granted preliminary approval of the settlement class, and ordered notice of the proposed settlement agreement be provided to the class. The trial court ordered the notice inform the class of the deadline to opt-out, object, and submit a claim form, as well as the date of the fairness hearing. The trial court held a formal fairness hearing on October 7, 2020, and November 17, 2020, during which the parties presented testimony and evidence in support of, and in opposition to, the proposed settlement agreement.

The *Pollard* Court further noted that Louisiana courts refer to cases interpreting the federal class action statute because the Louisiana class action statute is largely derived from the federal class action statute, which is codified at Federal Rule of Civil Procedure 23. 2010-0788, p. 11, 102 So.3d at 79-80. Federal courts often grant preliminary approval of a class settlement with no formal hearing, much less notice to any named plaintiff who objected to the settlement. *See* Kent A. Lambert, *Class Action Settlements in Louisiana*, 61 LA. L. REV. 89, 125 (2000). Appellants' argument that La. C.C.P. art. 963 applied, thereby requiring service of the joint motion and a contradictory hearing, is misplaced.

Significantly, to the extent that La. C.C.P. art. 963 applied, class counsel and the trial court complied. Class counsel informed the named plaintiffs of the terms

of the proposed settlement agreement in October 2019. Class counsel provided notice of the hearing date to the named plaintiffs objecting to the proposed settlement agreement. Counsel for Soileau Plaintiffs filed an opposition to the joint motion; appeared at the February 18, 2020 hearing; and argued against the granting of the joint motion for preliminary approval at the hearing. Additionally, counsel for Soileau Plaintiffs requested a thirty-day extension to file an opposition to the joint motion. Counsel for Soileau Plaintiffs also did not object to a lack of service. Counsel for Soileau Plaintiffs noted that Fair Grounds Defendants and HBPA had not filed an answer. Further, Counsel for Soileau Plaintiffs provided he would require two days to present evidence at the fairness hearing. Class counsel and counsel for Fair Grounds Defendants set forth reasons to move forward with setting dates to opt-out, object, and submit a claim form. The trial court clearly held a contradictory hearing as contemplated by La. C.C.P. art. 963. This argument lacks support.

### *Applicability of White v. White*

Appellants cite this Court's decision in *White v. White*, 398 So.2d 1257 (La. App. 4 Cir. 1981). Therein, this Court declared a judgment of contempt, which imposed both a fine and a jail term, to be absolutely null because the record reflected no service and no evidence the appellant received notice of the proceeding. *White*, 398 So.2d at 1259. Appellants contend the February 18, 2020 order is likewise an absolute nullity.

In their briefs, Appellees again note that counsel for Appellants appeared on February 18, 2020, and argued the merits of the motion. Appellees contend that counsel for Appellants did not object due to a lack of service. Thus, Appellees conclude that Appellants waived the right to object to a lack of service.

48

We find the facts in *White* are distinct from those found herein. In *White*, the wife filed a rule for contempt and requested service on the husband via the long-arm statute. *White*, 398 So.2d at 1258. At the hearing, the wife and her counsel appeared, but the husband did not. *Id.* The trial court granted the rule for contempt, imposed a fine on the husband, and sentenced him to a jail term. *Id.* This Court determined:

> [A] judgment rendered against a defendant who has not been served with process and who has not entered a general appearance is an absolute nullity. C.C.P. 2594, 2002(2), *Thompson v. Courville*, 372 So.2d 579 (La. App. 3rd Cir. 1979). Since the record reflects no service whatsoever in this matter, and since there is no evidence of appellant being given notice of the summary proceedings set for October 12, 1979, then the judgment based on this hearing and rendered on October 17, 1979 is an absolute nullity.

*Id.,* 398 So.2d at 1259.

Unlike *White*, the record herein reflects service of the hearing date. Also, unlike *White*, the judgment herein is not an appealable judgment.[31] Additionally, unlike *White*, Appellants voluntarily waived an objection regarding service by making a general appearance and arguing the merits of the joint motion without objection. Thus, Appellants' reliance upon *White* is misplaced.

### *Applicability of Louisiana District Court Rule 9.8*

Appellants lastly contend the hearing on the joint motion violated Rule 9.8 of the Louisiana District Court Rules. The pertinent part of La. Dist. Ct. Rule 9.8 states:

> In cases other than juvenile and family law proceedings, no hearing on an exception or motion will be scheduled until at least fifteen calendar days after filing. A party seeking to have an exception or motion heard less than fifteen days after filing shall show

---

[31] A judgment imposing sanction for contempt is a final judgment subject to appeal pursuant to La. C.C.P. art. 1915(A)(6).

good cause and shall state in the exception or motion the reasons why an expedited hearing is necessary.

Rule 9.8(c), La. Dist. Ct. Rules.

Appellants assert the trial court erred in holding a hearing on February 18, 2020, because the parties filed the joint motion on February 14, 2020, which was fewer than fifteen days before the hearing. Appellants contend this violates procedural due process. Appellants did not cite to any law or jurisprudence in support of the assertion of procedural due process.

In their briefs, Appellees again note counsel for Appellants appeared on February 18, 2020, and argued the merits of the motion. Appellees also contend counsel for Appellants did not object due to an alleged violation of La. Dist. Ct. Rule 9.8. Thus, Appellees conclude that Appellants waived the right to object.

As we previously noted, Class Representatives and Fair Grounds Defendants filed the joint motion to set hearing dates for class certification and related relief on January 23, 2020. The trial court set a hearing for February 18, 2020. On January 29, 2020, class counsel notified Appellants of the February 18, 2020 hearing date by letter sent via Federal Express. Appellants filed an opposition to the joint motion for preliminary approval of class settlement, appeared at the hearing, participated in the hearing, and did not object to a violation of La. Dist. Ct. Rule 9.8.

Admittedly, the parties filed the joint motion for preliminary approval on February 14, 2020, which was four days before the February 18, 2020 hearing. However, Appellants suffered no prejudice due to the alleged violation of La. Dist. Ct. Rule 9.8. *See In re Succession of Benoit*, 2014-0546, p. 4, n. 1 (La. App. 5 Cir. 11/25/14),165 So.3d 1017, 1018 (wherein the appellant asserted a lack of sufficient

notice to defend against a summary judgment and the Fifth Circuit Court of Appeal determined the appellant was not prejudiced because she filed an opposition to the motion, including three supporting affidavits). As noted, counsel for Soileau Plaintiffs filed an opposition, appeared at the hearing, and participated in the hearing. While counsel for Soileau Plaintiffs requested additional time to prepare for the fairness hearing, counsel then indicated he would require two days to present evidence at the fairness hearing. Appellants failed to demonstrate any prejudice due to the alleged violation of La. Dist. Ct. Rule 9.8. This argument lacks support.

***Assignment of Error No. 2 – The Trial Court Erred in Not Resetting Deadlines Due to COVID-19.***

Pursuant to the crisis imposed by COVID-19, Governor Edwards issued a public health emergency declaration on March 11, 2020. 25 JBE 2020. In connection therewith, the Louisiana Supreme Court issued an order dated March 20, 2020, continuing all civil trial, hearings, and court appearances set between the date of the order and April 13, 2020. Appellants contend the Governor's Proclamations and the Supreme Court's orders required the rescheduling of the deadlines (to opt-out or object to the proposed settlement agreement) contained in the February 18, 2020 preliminary order. Appellants aver the time between the receipt of the notice and the time to respond was impacted because the deadlines occurred during the declared state of emergency. Appellants contend any resulting hearing or order violated the due process rights of the entire class. However, Appellants did not cite to any law or jurisprudence in support of the assertion of a violation of due process rights.

51

In their brief, Fair Grounds Defendants explain that Appellants filed a motion for clarification concerning the deadlines, and, in response, the trial court set a telephone status conference. During the telephone status conference, the trial court accommodated the request of Appellants to reschedule the fairness hearing to October 7 - 9, 2020. Fair Grounds Defendants contend that counsel for Appellants did not raise the deadlines to opt-out, object, or submit a claim form due to COVID-19, or otherwise, during the telephone status conference.

Further, Fair Grounds Defendants aver that the plain language of the Governor's Proclamations and the Supreme Court orders did not supersede or vacate any deadline. Rather, Fair Grounds Defendants contend the Governor's Proclamations and the Supreme Court's orders extended certain legal deadlines.

Fair Grounds Defendants note that during the 2020 legislative session, the Louisiana Legislature enacted Louisiana Act 162, which extended all legal deadlines impacted by the Governor's Proclamations to July 6, 2020.[32] Fair Grounds Defendants submit the Supreme Court's orders did not vacate the deadlines to opt-out or object. The Supreme Court's March 20, 2020 order addressed "civil trials, hearings and court appearances." The Supreme Court's April 6, 2020 order continued jury trials and non-emergency in person-proceedings scheduled prior to May 4, 2020, to a date to be reset by trial court order. Fair Grounds Defendants note the only trial, hearing, or court appearance contained in the February 18, 2020 order was the fairness hearing, which was originally scheduled for April 27, 2020, but reset for October 7 - 9, 2020 (and ultimately held on October 7, 2020, and November 17, 2020).

---

[32] 2020 La. Acts 162 was codified as La. R.S. 9:5828 - 5830.

Lastly, Fair Grounds Defendants contend that Appellants lack standing to raise lack of due process as to this issue. Fair Grounds Defendants note that new counsel represented Appellants and filed objections to the proposed settlement agreement. Appellants did not opt-out of the proposed settlement agreement. Fair Grounds Defendants avow the Governor's Proclamations and/or the Supreme Court's orders did not confuse Appellants because they timely filed objections to the proposed settlement agreement. Further, Appellants fully participated in the full trial on the fairness of the proposed settlement agreement. Fair Grounds Defendants aver that Appellants may not now claim confusion to an order after fully complying with the order.

Likewise, Class Representatives argue that Appellants misconstrue the Governor's Proclamations and the Supreme Court's orders pertaining to COVID-19. Class Representatives aver that the Governor's Proclamations and the Supreme Court's orders extended deadlines, not vacated deadlines.

This Court first notes that the February 18, 2020 order required class members to opt-out by April 13, 2020, and to object by April 3, 2020. The individual Appellants filed their objections to the proposed settlement agreement timely and failed to present evidence that a single member of the class suffered confusion about the deadlines due to the Governor's Proclamations or the Supreme Court's orders.

Turning to the language contained in the Governor's Proclamation itself, the Proclamation notably declared that legal deadlines were "suspended."[33] The Supreme Court ordered that all civil trials, hearings, and court appearances were

---

[33] *See* 30 JBE 2020; 84 JBE 2020.

continued and would be re-set.[34]  Further, the Louisiana Legislature codified the Governor's Proclamations and proclaimed:

> All prescriptions, including liberative, acquisitive, and the prescription of nonuse, abandonment periods, and all peremptive periods shall be subject to a limited suspension or extension during the time period of March 17, 2020, through July 5, 2020; however, the suspension or extension of these periods shall be limited and shall apply only if these periods would have otherwise expired during the time period of March 17, 2020, through July 5, 2020. The right to file a pleading or motion to enforce any right, claim, or action which would have expired during the time period of March 17, 2020, through July 5, 2020, shall expire on July 6, 2020.

La. R.S. 9:5829(A).

This Court discussed La. R.S. 9:5829(A) in *American Global Insurance Co., v. 4503 Prytania Street, L.L.C.*, 2020-0438 (La. App. 4 Cir. 4/4/21), __ So.3d __, 2021 WL 1399742.  Therein, this Court determined that "the statutory language [of La. R.S. 9:5829(A)] is clear and unambiguous.  All deadlines were subject to a 'limited suspension or extension until July 6, 2020.'  Thus, any deadline that would have expired between March 17, 2020 and July 5, 2020, expired July 6, 2020." *American Global Ins. Co.*, 2020-0438, p. 3, 2021 WL 1399742 at *2.

The Governor's Proclamations and La. R.S. 9:5829(A) did not vacate any deadlines.  Pursuant to the clear and unambiguous language contained in La. R.S. 9:5829(A) and *American Global*, the deadlines to opt-out or object contained in the February 18, 2020 order, which are deadlines that would have expired between March 17, 2020, and July 5, 2020, expired July 6, 2020.[35]  Further, the deadlines to submit opt-out or objection forms did not contemplate a court hearing, trial, or the like.  Thus, the Supreme Court's orders did not affect the deadlines contained in

---

[34] *See* La. Sup. Ct. Orders dated March 16, 2020, and March 20, 2020.

[35] The Governor's Proclamations and La. R.S. 9:5829(A) did not impact the August 1, 2020 deadline to mail a claim form.

the February 18, 2020 order. The Supreme Court's orders affected the date of the fairness hearing. The trial court properly reset the fairness hearing by order.

The Court is cognizant that USPS continued mail service throughout the COVID-19 pandemic. The February 18, 2020 order set the deadline to file an objection for April 3, 2020. On April 2, 2020, Appellants all filed objections timely. Appellants failed to present evidence that any class member encountered difficulties in receiving or sending mail.

Appellants did not cite any authority for the assertion of a violation of the due process rights of the members of the class. Considering the importance of the due process right guaranteed by both the United States and Louisiana Constitutions, we will briefly address the issue. This Court discussed due process in the context of a class action and noted:

> "Adequate notice is one of the most elementary requirements of procedural due process." *Vincent v. Vincent*, 2011-1822, p.13 (La. App. 4 Cir. 5/30/12), 95 So.3d 1152, 1161. "Adequate notice given must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Id.* (citation omitted). Moreover, "procedural due process requires an opportunity to be heard." *Miller v. Crescent City Health Care Ctr.*, 2011-0403, pp. 3-4 (La. App. 4 Cir. 11/9/11), 78 So.3d 219, 221 (citation omitted).

*Claborne v. Hous. Auth. of New Orleans*, 2014-1050, pp. 25-26 (La. App. 4 Cir. 4/15/15), 165 So.3d 268, 288.

As indicated earlier, the racing industry is highly regulated by the Commission. In accordance with laws, regulations, and rules, Fair Grounds Defendants provide money to HBPA and HBPA pays the owners, trainers, and jockeys who win quarter-horse and thoroughbred races. HBPA keeps records of this information and easily compiled the names and addresses of the winners of quarter-horse races beginning January 1, 2008, through the time of the settlement.

HBPA mailed approximately 3,567 notices. USPS returned three or four notices[36] as undeliverable. One claimant opted out. Ten class members filed objections. Approximately 179 class members submitted claim forms.

In *Etter v. Hibernia Corp.*, objectors to a class settlement complained the notice sent to class members was deficient. 2006-0646, p.12 (La. App. 4 Cir. 2/14/07), 952 So.2d 782, 791. This Court first noted that La. C.C.P. art. 594(A)(2) requires notice of a settlement to be given in the manner that the court directs. *Etter*, 2006-0646, p.12, 952 So.2d at 791. The trial court issued a scheduling order requiring a notice to be sent to the class members no less than thirty days prior to the fairness hearing. The parties mailed the notice more than thirty days prior to the fairness hearing. This Court noted the objectors themselves received notice. Further, this Court indicated not a single class member sought to extend the time to object or claimed deprivation of the right to object. This Court determined the objectors' complaint about the deficient notice to be without merit. *Id.*

Likewise, the class members in this case received notice of the proposed settlement agreement and the date of the fairness hearing. Significantly, no member of the class requested an extension or otherwise claimed deprivation of the right to object based on the COVID-19 pandemic or otherwise. Indeed, Appellants themselves received the notice, complied with the notice by submitting objections timely, and fully participated in the fairness hearing. There is no evidence that the failure to set new deadlines and send a new notice violated the due process rights of any class member. This argument is without merit.

---

[36] As noted previously, Mr. Boulet testified that USPS returned four notices; but in the record before this Court, Exhibit #28 contains only three notices returned as undeliverable.

*Assignment of Error No. 3 - The Class Notice was Defective*

Lastly, in support of the argument the trial court should have vacated the February 18, 2020 order, Appellants contend the class notice was defective. They aver that the class notice failed to provide any information concerning the opposition by a majority of the Plaintiffs; the amount of the disputed purses; the amount of attorneys' fees; the fact the court had not ruled on the merits; or the position of the parties. In support, Appellants reference *State v. Sprint Commc'n Co., L.P.,* 2003-1264 (La. App. 1 Cir. 10/29/04), 897 So.2d 85, *on reh'g* (April 6, 2005), *writ denied*, 2005-1180 (La. 12/9/05), 916 So.2d 1056 and *writ denied*, 2005-1190 (La. 12/9/05), 916 So.2d 1057 ("*Sprint*"). However, Appellants cite to no particular portion of the *Sprint* opinion.

In response, Fair Grounds Defendants assert the class notice was not defective. Fair Grounds Defendants note the *Sprint* court differentiated between information that must be included and information a trial court should consider for inclusion in a class notice. Fair Grounds Defendants aver the class notice sent out in this case was very detailed and included all information required by La. C.C.P. art. 594.

Fair Grounds Defendants note that Appellants consistently assert that a majority of the Plaintiffs objected to the proposed settlement agreement. Fair Grounds Defendants aver that Plaintiffs' approval to the proposed settlement agreement is not necessary. Fair Grounds Defendants cite several federal cases in support of this point. In *Charron v. Wiener*, 731 F.3d 241, 254 (2d Cir. 2013), the United States Court of Appeals, Second Circuit, determined:

> Finally, to the extent that appellants argue that the rejection of the settlement by all five remaining named class representatives requires its rejection by the Court, we cannot agree. As our sister

57

circuits have noted, the assent of class representatives is not essential to the settlement, as long as the Rule 23 requirements are met. *See Elliott v. Sperry Rand Corp.*, 680 F.2d 1225, 1226, 1228 (8th Cir.1982); *Kincade v. Gen.Tire & Rubber Co.*, 635 F.2d 501, 508 (5th Cir.1981) ("[T]he assent of named plaintiffs is not a prerequisite to the approval of a settlement." (internal quotation marks omitted)); *Laskey v. Int'l Union*, 638 F.2d 954, 957 (6th Cir.1981) ( "Accepting a settlement over the objections of the named representatives is not necessarily an abuse of discretion."); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 n. 19 (4th Cir.1975). "Class counsel is supposed to represent the class, not the named parties: that the named parties objected does not prove the settlement was unfair or that the class counsel acted improperly." *Laskey*, 638 F.2d at 956. We believe those cases correctly state the law.

731 F.3d 241, 254 (2d Cir. 2013).

Thus, Fair Grounds Defendants aver that the approval of Plaintiffs, whether a majority or otherwise, was not necessary for the trial court to grant preliminarily approval of the class settlement.

Likewise, Class Representatives contend that the notice contained all of the information required by law. The notice defined the class; described the terms of the proposed settlement agreement; described the payout procedure for past due claims; informed members of the right to opt-out or object; informed them of the process to submit a claim; and notified them of the time and place of the fairness hearing. The notice did not mention attorneys' fees. Class Representatives note that Appellees are paying the fees separately from the amount of the settlement. Further, Class Representatives aver the law does not require that information to be included.

In Louisiana, class action proceedings are governed by La. C.C.P. art. 591, *et seq.* Once a class is certified, the best practicable notice must be provided to the members of the class. La. C.C.P. art. 592(B)(1). The notice shall include:

(a) A general description of the action, including the relief sought, and the names and addresses of the representative parties or, where

appropriate, the identity and location of the source from which the names and addresses of the representative parties can be obtained.

(b) A statement of the right of the person to be excluded from the action by submitting an election form, including the manner and time for exercising the election.

(c) A statement that the judgment, whether favorable or not, will include all members who do not request exclusion.

(d) A statement that any member who does not request exclusion may, if the member desires, enter an appearance through counsel at that member's expense.

(e) A statement advising the class member that the member may be required to take further action as the court deems necessary, such as submitting a proof of claim in order to participate in any recovery had by the class.

(f) A general description of any counterclaim brought against the class.

(g) The address of counsel to whom inquiries may be directed.

(h) Any other information that the court deems appropriate.

La. C.C.P. art. 592(B)(2).

As this matter involves a proposed settlement or compromise of a class action, La. C.C.P. art. 594 is implicated. Louisiana Code of Civil Procedure Article 594(A) mandates notice of the proposed settlement or compromise be provided to all members of the class in the manner directed by the trial court. After the class receives notice, then the trial court "shall order a hearing to determine whether the proposed compromise is fair, reasonable, and adequate for the class. At such hearing, all parties to the action, including members of the class, shall be permitted an opportunity to be heard." La. C.C.P. art. 594(B).

The first requirement is that the notice contain a general description of the action, including the relief sought and the names and addresses of the representative parties, or, where appropriate, the identity and location of the source

from which the names and addresses of the representative parties can be obtained. The notice herein provided the title of the action, including the trial court's docket number. The notice indicated the Petition claimed Fair Grounds Defendants failed to pay supplemental purse money from video poker revenue to quarter-horse races as required by La. R.S. 27:438. The notice averred the Petition claimed HBPA allowed this to happen. The notice set forth the defenses of Fair Grounds Defendants: La. R.S. 27:438 does not apply to quarter-horse races, and the revenues were distributed in accordance to the terms set forth in the condition books, orders of the Commission, and other Louisiana law, such that the claims were barred by estoppel. The notice indicated Fair Grounds Defendants disputed liability. The notice provided the names of the Class Representatives and that the addresses of the Class Representatives were located in the record.

The second requirement mandates that the notice inform the class members that they had the right to exclude themselves from the action. The notice herein included the approved opt-out form and instructed the class members desiring to exclude themselves that they must complete the opt-out form and return it to HBPA. The notice included the address for HBPA and provided the deadline to opt-out.

The third requirement mandates inclusion of a statement that informs the class they will be bound by the judgment, favorable or not, if they do not opt-out. The notice herein informed class members if they did not opt-out, the judgment would be binding on them.

The fourth requirement is inclusion of a statement that a member who does not opt-out may enter an appearance through counsel. The notice provided that a member could file an objection through counsel who enrolled in the lawsuit.

The fifth requirement is inclusion of a statement advising the member that they may be required to submit a claim form. The notice herein advised members who wished to participate in the settlement to return the attached claim form. Specifically, the notice advised the class members to return the completed form to HBPA, provided HBPA's address, and set forth the deadline to submit the claim form.

The sixth requirement mandates inclusion of any counterclaim brought against the class. In this instance, Fair Grounds Defendants and HBPA did not file any counterclaims. Notably, Fair Grounds Defendants had the owners execute the 2019 Stall Agreement that contained a waiver of claims against Fair Grounds Defendants. The notice therein warned those desiring to opt-out that Fair Grounds Defendants intended to raise the waiver as a defense in any litigation. While the warning is a defense and not a counterclaim, the inclusion of the warning speaks to the thoroughness of the notice.

The seventh requirement is inclusion of the address of counsel to whom the class member may direct inquiries. The notice herein informed class members they could direct inquiries to class counsel and provided the addresses and telephone numbers of class counsel.

The last requirement is inclusion of any other information the court deems appropriate. In this instance, no one requested the inclusion of other information. The court did not deem the inclusion of any other information appropriate.

Appellants claimed certain information was required to be included in the notice pursuant to *Sprint*. In *Sprint*, the First Circuit Court of Appeal determined:

> Notice required to be sent in a class action **must** provide the class members with information sufficient to consider the terms of the proposed settlement and determine whether there is a basis for

61

challenging the proposed settlement. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 558 (E.D.La.1993). Further, notice in a class action **should**: describe succinctly and simply the substance of the action and the positions of the parties; identify the opposing parties, class representatives, and counsel; indicate the relief sought; explain any special risks of class members, such as being bound by the judgment, while emphasizing that the court has not ruled on the merits of any claims or defenses; and, describe clearly the procedures and deadlines for opting out. Robert H. Klonoff and Edward K.M. Bilich, *Class Actions and Other Multi-Party Litigation*, p. 393 (West 2000), citing *Manual for Complex Litigation* (Third), § 30.21 (1995).

2003-1264, pp. 10-11, 897 So.2d at 93 (emphasis added).

Herein, the notice outlined the terms of the proposed settlement agreement. It informed the members they were eligible for a cash payment for past claims from the settlement amount of $1,000,000.00. In addition to a cash payment for past claims, the proposed settlement agreement included guaranteed funds for future purse supplements. Not only did the parties agree to the purse supplements for the future, the parties requested the Louisiana Legislature amend existing legislation adopting the terms of the proposed settlement agreement. As amended, La. R.S. 27:438 specifies "[t]welve and one-half percent of the monies earned for such purse supplements shall be used to supplement purses for quarter[-]horse races at that licensed eligible facility, or as authorized by R.S. 4:147.1,[37] up to a maximum of one million dollars per state fiscal year." La. R.S. 27:438(B)(2)(a). Additionally, Fair Grounds Defendants agreed to increase the number of quarter-horse racing days from ten to fifteen. The notice informed the class that Fair Grounds Defendants disputed all liability in the case and set forth numerous defenses asserted by Fair Grounds Defendants, including: 1) La. R.S. 27:438 does not allocate funds to quarter-horsemen thus the class should not have received the

---

[37] Louisiana Revised Statutes 4:147.1 is titled "Commission; purse supplements; additional or substitute races and race days; force majeure."

purse supplements described therein; 2) the funds were disbursed to horsemen in accordance with approved condition books; 3) the funds were disbursed to horsemen by orders of the Commission; 4) the funds were disbursed to horsemen in accordance with Louisiana law; and 5) Plaintiffs' claims were barred by estoppel. The class members possessed sufficient information regarding the terms of the proposed settlement agreement and the defenses asserted by Fair Grounds Defendants to make an informed decision to opt-out, object, submit a claim form, or do nothing.

Further, the notice herein described the substance of the action and the positions of the parties; identified the opposing parties, class representatives, and counsel; indicated the relief sought; explained any special risks of class members, such as being bound by the judgment; and described clearly the procedures and deadlines for opting out and objecting. In this instance, the notice did not specify whether the court had ruled on the merits of the claims or defenses. However, whether the court ruled on the merits or defenses is not information required by the class action statutes. Notably, in *Sprint*, the First Circuit Court of Appeal indicated that information *should* be included, not that it *must* be included in the notice. 2003-1264, pp. 10-11, 897 So.2d at 93. There is no requirement that the notice include the amount in controversy, reveal that some named plaintiffs oppose the settlement, specify the number of members in the class, or provide the amount of attorneys' fees. Additionally, the public record of this proceeding identified the disputed amount of video poker purse funds; revealed that the trial court had not ruled on the merits; demonstrated that some named plaintiffs opposed the settlement; listed the number of members in the class; and provided the amount of attorneys' fees, as well as the fact that the attorneys' fees are in addition to the

settlement amount, i.e., the fees will not reduce the $1,000,000.00 settlement amount for past due claims.

The notice herein complied with the statutory requirements. HBPA mailed the notice well in advance of the fairness hearing, which gave every member the opportunity to consult outside counsel, ask questions of the class counsel, opt-out, or object. The trial court properly approved the notice of the proposed settlement agreement. As the trial court did not abuse its discretion, the November 12, 2020 judgment denying the motions to vacate is affirmed.

**2021-CA-0049: Appeal of the Trial Court's Preliminary Approval of the Proposed Settlement Agreement**

In this appeal, Appellants seek review of the trial court's February 18, 2020 order, which granted preliminary approval of the settlement agreement. Appellants assign five errors:

[1]. The Trial Court erred in granting the "Joint Motion for Preliminary Approval of Settlement Agreement.

[2]. The Trial Court erred in not resetting the deadlines as required by the Governor's Proclamations and Supreme Court's Orders in response to COVID-19.

3. The class notice is defective.[38]

4. [Appellees] have failed to dispute the allegations of the petition(s) and therefore the Court is without any evidence from [Appellees] to determine whether there is probable cause to notify the class of the proposed settlement.

5. Issues Raised by Soileau Plaintiffs' Second Amended Petition Have Never Been Admitted or Denied by [Appellees] as Required by Louisiana Code of Civil Procedure Articles 1001-1006; and Therefore, Have Not Been Addressed by the Court.

---

[38] Appellants did not assign the last three contentions as error or include them as an issue presented for review, but they did include them as major headings in the argument and designated them as numbers three, four, and five. Likewise, Appellees responded to the arguments with corresponding numbers. For consistency, this Court will utilize the numbering of the parties.

Each of these is discussed in turn.

**Jurisdiction to Consider the February 18, 2020 Judgment**

Appellants seek review of the February 18, 2020 judgment, which granted the "Joint Motion for Preliminary Approval of Class Action Settlement Agreement and for Related Relief." The February 18, 2020 order set deadlines to opt-out, object, and submit a claim form, as well as set a date for the fairness hearing. Appellees aver that the February 18, 2020 order is interlocutory. Thus, Appellees contend this Court lacks jurisdiction to consider the merits of the February 18, 2020 order.

We agree the February 18, 2020 order did not determine the merits in whole or in part. Thus, it is interlocutory and not appealable unless expressly provide by law. *See* La. C.C.P. art. 2083(C). The February 18, 2020 order grants preliminary approval of the class. The class action statutes expressly provide that one may take a suspensive or devolutive appeal from an order or judgment maintaining a class action. La. C.C.P. art. 592(A)(3)(c). Nonetheless, Appellants' arguments substantively do not address the certification of the class. Thus, La. C.C.P. art. 592 does not provide authority for an express appeal of an interlocutory judgment.

Nonetheless, as indicated previously, while an interlocutory judgment may not itself be immediately appealable, it is nevertheless subject to review by an appellate court when an appealable judgment is rendered in the case. *Elysian, Inc.,* 2020-0674, p.9, 325 So.3d at 1083 (*citing People of the Living God*, 251 La. at 947-48, 207 So.2d at 753).

Appellants were not entitled to appellate review of the February 18, 2020 judgment granting preliminary approval of the settlement agreement at the time of

the lodging of the appeal in this Court on February 1, 2021, because the judgment was interlocutory. However, on January 28, 2021, the trial court rendered a final judgment in this matter. Thereafter, Appellants sought an unrestricted appeal of the final judgment, and this Court ordered consolidation of the appeals. Thus, this Court will review the interlocutory judgment, which granted preliminary approval of the proposed settlement agreement, as part of the unrestricted appeal of the final judgment rendered January 28, 2021.

## STANDARD OF REVIEW

This appeal seeks review of the February 18, 2020 order granting preliminary approval of the settlement agreement. Appellate courts review a trial court's decision on a motion for preliminary approval of a class settlement under the abuse of discretion standard. In *Pollard*, this Court reviewed a judgment granting a motion for preliminary approval of a class settlement. *Pollard*, 2010-0788, p.10, 102 So.3d 79. This Court determined the following fundamentals guide the Court's review of class certification cases:

Furthermore,

> "[f]our fundamentals guide our review of class certification cases[:] (1) the standard of our review is abuse of discretion; (2) we are to be guided by the state and federal jurisprudence interpreting Federal Rule 23 and our own law; (3) for purposes of certification, a court is not permitted to review the claims in a case on their substantive merits; and (4) the burden is on the plaintiffs to establish that the statutory criteria for a class certification are met." *Duhe v. Texaco*, 2008-0665, p. 3 (La. App. 3d Cir. 12/10/08), 998 So.2d 1220, 1222–1223, *citing Duhe v. Texaco*, 779 So.2d 1070 [(La. App. 3 Cir. 2/7/01)].

*Id.*

***Assignment of Error No. 1 - The Trial Court Erred in Granting the Joint Motion for Preliminary Approval of the Proposed Settlement Agreement***

In support of this assignment, Appellants repeat their argument from assignment of error number one in 2021-CA-0022. Specifically, Appellants contend that Appellees failed to serve the joint motion as required by La. C.C.P. art. 2002; La. C.C.P. art. 963; La. C.C.P. art. 1312; and this Court's decision in *White*. Appellants aver that the joint motion and hearing date did not comply with La. Dist. Ct. Rule 9.8. Thus, Appellants conclude that this Court should reverse the February 18, 2020 judgment, which granted preliminary approval of the proposed settlement agreement. Appellants cite no new law or jurisprudence in support of their argument. For the reasons set forth above, we find this assignment of error to be without merit.

***Assignment of Error No. 2 - The Trial Court Erred in Not Resetting Deadlines Due to COVID-19***

In support of this assignment, Appellants reassert the same argument from assignment of error number two in 2021-CA-0022. Appellants contend that the trial court erred in not resetting deadlines (to opt-out, etc.) as required by the Governor's Proclamations and Supreme Court's Orders in response to the COVID-19 pandemic. Appellants contend this Court must vacate the February 18, 2020 order, which granted preliminary approval of the proposed settlement agreement, due to the failure to reset those deadlines. Appellants cite no new law or jurisprudence in support of their argument. For the reasons set forth above, we find this assignment of error to be without merit.

***Assignment of Error No. 3 - The Class Notice was Defective***

In support of this assignment, Appellants reassert the same argument from assignment of error number three in 2021-CA-0022. Appellants contend the notice

failed to provide an accurate characterization of the matter. Thus, Appellants conclude the defect in the notice could not be cured by a fairness hearing. Appellants cite no new law or jurisprudence in support of their argument. For the reasons set forth above, we find this assignment of error to be without merit.

***Assignment of Error No. 4 - The Trial Court Lacked Evidence to Determine There was Probable Cause to Notify the Class of the Proposed Settlement Agreement***

In support of this assignment of error, Appellants contend Fair Grounds Defendants and HBPA did not answer the petition. Appellants aver that the trial court lacked evidence to determine whether probable cause existed to notify the class of the proposed settlement agreement. Appellants note that a court must conduct preliminary approval of the proposed settlement agreement and determine whether it is within the range of possible approval, or, in other words, whether probable cause exists to notify the class of the proposed settlement agreement. Then, the court conducts a fairness hearing wherein the court affords all parties an opportunity to be heard on the proposed settlement agreement. Appellants insist that without an answer, the trial court could not determine whether the proposed settlement agreement was within the range of possible approval. In support, Appellants cite *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825 (E.D. N.C. 1994).

Additionally, in the summary of their argument, Appellants contend the trial court failed to issue an order containing detailed factual findings with respect to the factors necessary for class certification. Appellants cite La. C.C.P. arts. 591(A), 591(B)(1)(b), and 591(B)(3) in support. Appellants failed to brief this contention in the "Argument" section of their brief to this court.

In their brief, Fair Grounds Defendants submit that Appellants' claim that the trial court could not settle the class action absent the filing of an answer is baseless. Fair Grounds Defendants note that Appellants cited *Horton*, 855 F.Supp 825. Fair Grounds Defendants argue that nothing in the *Horton* decision supports Appellants' argument. Fair Grounds Defendants contend this matter did not just "fall in the lap" of the district court. Rather, Fair Grounds Defendants aver that the parties litigated this matter for six years before the Commission, the district court, and this Court. Fair Grounds Defendants submit the trial court acquired substantial knowledge of the claims and defenses of the parties over the years and that a formal answer would not add anything to the understanding of the trial court in this matter.

Fair Grounds Defendants aver that the trial court did not err in declining to produce written detailed factual findings. Fair Grounds Defendants note that written reasons are required if a party makes a request no later than ten days after notice of the order. La. C.C.P. art. 592(A)(3)(c). Fair Grounds Defendants assert no party requested written reasons for the class certification.

Fair Grounds Defendants contend that Appellants' argument regarding the February 18, 2020 order is moot. Fair Grounds Defendants submit that the trial court issued a final judgment on the settlement, which mooted any argument regarding the preliminary order.

In their response, Class Representatives aver that Fair Grounds Defendants disputed the claims in every pleading they filed since 2014. Class Representatives reference the memorandum in support of the exceptions of primary jurisdiction, no cause of action, and nonjoinder of proper parties-in-interest, which Fair Grounds Defendants filed in 2014. Therein, Fair Grounds Defendants averred that "[t]he

Plaintiffs' interpretation of the statute governing video poker purse funds is not only incorrect and contrary to other provisions of Louisiana's racing law, but would result in absurdly overfunding quarter horse purses to the great detriment of thoroughbred purses."

In *Pollard*, this Court determined that when considering a motion for preliminary approval, the trial court *"need only ascertain whether there is 'probable cause' to notify the class of the proposed settlement and to proceed with a fairness hearing."* *Pollard*, 2010-0788, p. 8, 102 So.3d at 78. If the proposed settlement falls within the range of possible approval, the court may grant preliminary approval and direct notice of the settlement to the class. *Id.*

Appellants contend the trial court could not determine probable cause without an answer on file, citing *Horton*. In *Horton*, the court did not imply or affirmatively state probable cause could not be determined without an answer on file. This Court found no reported decision that requires a defendant to file an answer prior to preliminary approval of a class settlement. Significantly, in one instance, the court found deficiencies and denied the motion for preliminary approval. *Munday v. Navy Fed. Credit Union*, unpub., SACV 15-1629-JLS (KESx), 2016 WL 7655796, at *5 (C.D. Cal. May 26, 2016). The court required that the parties cure the deficiencies by a certain date and then file a renewed motion for preliminary approval of a class action settlement. *Munday*, SACV 15-1629-JLS (KESx), 2016 WL 7655796, at *5. If the parties failed to file the renewed motion by the specified date, then the court ordered the defendant to file an answer or otherwise respond to the complaint. *Id.* Thus, the court determined it could grant preliminary approval of the class settlement absent an answer.

Moreover, since the filing of the initial petition in 2014, the trial court presided over numerous hearings. Beginning in 2014, Fair Grounds Defendants, in various pleadings, set forth the substance of their defenses to the claims. In the memorandum in support of the exceptions of primary jurisdiction, no cause of action, and nonjoinder of proper parties-in-interest filed on August 11, 2014, Fair Grounds Defendants averred that "[t]he Plaintiffs' interpretation of the statute governing video poker purse funds is not only incorrect and contrary to other provisions of Louisiana's racing law, but would result in absurdly overfunding quarter-horse purses to the great detriment of thoroughbred purses." On October 19, 2014, Fair Grounds Defendants filed exceptions to the First Amended Petition. In their memorandum in support, Fair Grounds Defendants averred that La. R.S. 27:438 passed years before mandatory quarter-horse racing at the Fair Grounds. Fair Grounds Defendants claimed that if the Louisiana Legislature had intended for La. R.S. 27:438 to apply to quarter-horse races, the Louisiana Legislature would have done so specifically. The same trial judge presided over all of the proceedings in civil district court. The trial court, over a period exceeding six years, gained knowledge of the defenses to the claims asserted in the petitions sufficient to determine probable cause.

Appellants cite La. C.C.P. art. 592 in support of their argument that the trial court did not issue an order containing detailed factual findings. However, no provision of La. C.C.P. art. 592 required the trial court to set forth detailed factual findings. Rather, La. C.C.P. art. 592 provides:

> If the court finds that the action should be maintained as a class action, it shall certify the action accordingly. If the court finds that the action should not be maintained as a class action, the action may continue between the named parties. In either event, the court shall give in writing its findings of fact and reasons for judgment *provided*

71

a request is made not later than ten days after notice of the order or judgment.

La. C.C.P. art. 592(A)(3)(c)(emphasis added). Appellants failed to make a request to the trial court to provide its findings of fact in writing. This assignment of error lacks merit.

### *Assignment of Error No. 5 - The Trial Court Failed to Address the Issues Raised in the Second Amended Petition*

Lastly, Appellants contend Fair Grounds Defendants and HBPA have not admitted or denied the issues raised in the Second Amended Petition. Appellants conclude the trial court did not address the issues contained therein. Further, Appellants aver La. C.C.P. arts. 1001 - 1006 required Fair Grounds Defendants and HBPA to dispute the issues raised in the Second Amended Petition, including whether Appellants committed conversion and/or conspired together to commit conversion; whether Appellants breached a fiduciary duty and/or conspired together to breach a fiduciary duty; whether Appellants breached a statutory duty and/or conspired together to breach a statutory duty; and whether Appellants invaded the business interests of the class and/or conspired together to invade the business interests of the class.

In response, Fair Grounds Defendants contend that Appellants mischaracterize La. C.C.P. art. 1004. Fair Grounds Defendants aver that La. C.C.P. art. 1004 does not deem admitted any allegation that a defendant does not deny. Rather, Fair Grounds Defendants note that La. C.C.P. art. 1004 provides that an allegation not denied in an answer is admitted. They note that their voluminous pleadings state why the claim to thirty-five million dollars is baseless. Further, Fair Grounds Defendants assert that Appellants failed to cite any case or other

legal authority to support their argument that an answer was required before preliminary approval of the proposed settlement agreement.

Additionally, Fair Grounds Defendants aver the list of "justiciable issues" is inflammatory and refuted by allegations in Appellants' own Second Amended Petition, as well as in publicly available information. For instance, Fair Grounds Defendants note that Appellants' claim that Fair Grounds Defendants committed conversion is a justiciable issue. Fair Grounds Defendants assert that the Second Amended Petition admitted the disputed funds were disbursed to thoroughbred horsemen and, inherently, no conversion took place. They also contend the publicly available information refutes the other justiciable issues. Specifically, Fair Grounds Defendants note that the publicly available information includes the orders issued by the Commission to Fair Grounds Defendants and HBPA to disburse the funds into the thoroughbred meet; the approved condition books for all races at the Fair Grounds revealing the sources of purse funds; HBPA records pertaining to the disbursement of the purse funds; and the State and the Commission audits of the purse funds.

Class Representatives note that the trial court granted the exceptions filed by Fair Grounds Defendants and Class Representatives in response to the Second Amended Petition. Class Representatives aver this Court denied Appellants' application for supervisory writs. Thus, Class Representatives contend they were not required to answer the Second Amended Petition.

Appellants' argument is unfounded. The trial court dismissed the Second Amended Petition. This Court denied Appellants' application for supervisory writs. There is no Second Amended Petition for Fair Grounds Defendants or HBPA to answer or for the trial court to consider. Further, as detailed above, an

73

answer is not required prior to a court granting preliminary approval to a class settlement. The voluminous record contains sufficient evidence for the trial court to make a probable cause determination and grant preliminary approval of the proposed settlement agreement. Our review of the record shows that the trial court possessed sufficient knowledge of the issues, including an understanding of the numerous defenses Fair Grounds Defendants intended to assert, to grant preliminary approval and instruct counsel to notify the class. As the trial court did not abuse its discretion, the February 18, 2020 judgment granting preliminary approval of the proposed settlement agreement is affirmed.

**2021-CA-0199: Appeal of the Trial Court's January 28, 2021 Final Judgment Approving the Proposed Settlement Agreement**

In this appeal, Appellants seek review of the trial court's January 28, 2021 final judgment, which followed the fairness hearing on October 7, 2020, and November 17, 2020, and granted approval to the proposed settlement agreement, the class, the class representatives, the amount of the settlement, the payout procedure, and $787,500.00 as reasonable attorneys' fees and reimbursement of expenses for class counsel. Appellants assign as error that "[t]he [t]rial [c]ourt abused its discretion in approving the [proposed] [s]ettlement [a]greement". They list seven issues presented for review:

A. Did the trial court err in approving the Settlement Agreement when no Defendant filed an Answer to the allegations and 8 out of 10 original plaintiffs, including class representatives, objected to the Settlement Agreement?

B. Did the trial court err in approving the Settlement Agreement when the Foreman Plaintiffs and Defendants failed to meet their burden showing the Settlement Agreement was in the best interests of the class?

C. Did the trial court err in approving the Settlement Agreement when Notice of Class Settlement was inadequate?

74

D.   Did the trial court abuse its discretion by approving the Settlement Agreement when the objection, opt out and opt in deadlines have yet to run?

E.   Did the trial court err in approving the Settlement Agreement when the Class Representatives failed to represent the class and fairly and adequately protect the interests of the class and their claims were not typical of the claims of the class as a whole?

F.   Did the trial court abuse its discretion by approving the Settlement Agreement when the Soileau Plaintiffs filed their Second Amended Petition?

G.   Did the trial court abuse its discretion by approving the Settlement Agreement when the Settlement Agreement is void "*ab initio*" by its own terms?

We address each issue listed by Appellants in turn.

## STANDARD OF REVIEW

Jurisprudence has long noted that "[t]he public interest strongly favors the voluntary settlement of class actions."[39] *Hays v. Eaton Grp. Attorneys, L.L.C.*, unpub.,17-88-JWD-RLB (M.D. La. Feb. 4, 2019), 2019 WL 427331 at *8 (quoting *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on April 20, 2010*, (E.D. La. 2012), 910 F.Supp.2d 891, 930, *aff'd sub nom.*, *In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014)). "Because the public interest strongly

---

[39] In the concurring opinion in *Orrill*, it was noted:

> One reason that class action settlements are favored, by way of example, is that "[i]n Orleans Parish, the Civil District Court has seen on average more than 20,000 suits per year over the last decade with an upward trend." [Lambert, *supra*, at 127] at n.7. As an inevitable result, "[e]ven one large class action suit . . . can forestall justice to literally thousands of litigants in these over-burdened state trial courts, as well as consume an inordinate amount of appellate court resources." *Id.* (citing Dawn M. Barrios, *The Long and Winding Road for Spitzfaden, Louisiana's Breast Implant Class Action: Ad Astra per Aspera,* 74 TUL. L.REV.1941 (2000)).

*Orrill v. AIG, Inc.,* 2009-0888, p.16 (La. App. 4 Cir. 4/21/10), 38 So.3d 457, 467-68 (Belsome, J., concurring).

favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable and adequate." *Hays,* 2019 WL 427331 at *8 (quoting *In re Oil Spill*, 910 F.Supp.2d at 930-31). Thus, an appellate court may not overturn a trial court's approval of a proposed settlement absent an abuse of discretion. *Orrill,* 2009-0888, p.11, 38 So.3d at 464 (citing *Reed*, 703 F.2d at 172).

***Issue (A) - The Trial Court Erred in Approving the Settlement Because No Defendant Filed an Answer***

Appellants contend courts utilize a two-step approach in approving a class settlement. In support, Appellants cite *Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980).[40] Therein, the United States Court of Appeals, Seventh Circuit, indicated a court must first determine whether the proposed settlement is within the range of possible approval or whether there is probable cause to notify the class of the settlement. *Armstrong*, 616 F.2d at 314. If the court finds the settlement is within the range of possible approval, the court allows the parties to notify the class of the settlement and holds a fairness hearing, at which all interested parties have the opportunity to be heard, before the court determines whether the settlement is fair, reasonable, and adequate. *Id.*

Appellants contend the trial court could not determine whether the proposed settlement agreement was within the range of possible approval or whether

---

[40] *Armstrong* was overruled on other grounds in *Felzen v. Andreas*, 134 F.3d 873 (7th Cir.1998), *aff'd sub nom. California Pub. Employees' Ret. Sys. v. Felzen*, 525 U.S. 315; 119 S.Ct. 720; 142 L.Ed.2d 766 (1999)(overruling the portion of *Armstrong* allowing a nonparty to appeal from a decision in a class action). Appellants also cite *In Re Mid-Atlantic Toyota Antitrust Litig*., 564 F. Supp. 1379, 1384 (D. Md. 1983) in support.

probable cause existed to notify the class of the proposed settlement agreement because no defendant filed an answer. In support of this proposition, Appellants again cite *Horton*.

Further, Appellants repeat the assertion that the trial court did not issue specific and detailed factual findings regarding the preliminary approval of the proposed settlement agreement. In support, Appellants again cite La. C.C.P. art. 592.

Appellants contend the trial court could not supply the affirmative defenses for Appellees. For this point, Appellants cite *Dofflemyer v. Gilley*, 384 So.2d 435 (La. 1980) and *Prestenbach v. Sentry Insurance Co.*, 340 So.2d 1331 (La. 1976). They cite to no particular portion of the cases.

In support of this argument, Appellants again contend that a defendant shall file an answer, in which the defendant must admit or deny each allegation in the petition. They further assert that if the defendant fails to admit or deny an allegation in the petition, the allegation is treated as admitted. Appellants cite to La. Civil Law Treatise, Civil Proc., §6.9. Appellants argue that Appellees are attempting to settle the lawsuit when the court has not considered the claims that Fair Grounds Defendants and HBPA committed conversion, conspiracy, breach of fiduciary duties, breach of statutory duties, and invasion of the business interests of Plaintiffs.

In response, Fair Grounds Defendants aver nothing in *Horton* supports Appellants' argument that an answer is required for a trial court to grant preliminary approval of a proposed class settlement.[41] Fair Grounds Defendants

---

[41] On June 10, 2021, HBPA filed a motion to adopt the brief filed by Fair Grounds Defendants.

note the parties have litigated this matter for over six years before the Commission, the district court, and this Court. Fair Grounds Defendants aver the voluminous record provided the trial court with ample knowledge of the issues in this matter to determine whether the settlement is within the range of possible approval.

Fair Grounds Defendants contend the trial court was not required to issue written reasons. Fair Grounds Defendants note written findings are required when a party requests those findings within ten days after the notice of the order or judgment, as provided in La. C.C.P. art. 592(A)(3)(c). Fair Grounds Defendants aver that Appellants failed to make such a request.

Fair Grounds Defendants argue the trial court could issue final approval of the class settlement absent an answer. They note that Appellants cited no law or jurisprudence in support of their argument. Further, Fair Grounds Defendants aver the trial court received pre- and post- trial briefs addressing the merits, including defenses, and possessed sufficient information and evidence to determine whether the proposed settlement agreement was fair.

Fair Grounds Defendants next assert that Appellants misstate the wording of La. C.C.P. art. 1004. Specifically, Fair Grounds Defendants note that La. C.C.P. art. 1004 provides that allegations that are not denied in the answer are deemed admitted. They argue that nothing in La. C.C.P. art. 1004 supports Appellants' contention that allegations are admitted absent an answer.

Fair Grounds Defendants aver the trial court did not supply affirmative defenses to Fair Grounds Defendants and HBPA. Fair Grounds Defendants note the fairness hearing did not lead to a ruling on the merits. Rather, Fair Grounds Defendants explain that the trial court considered the legal issues and the evidence

presented at the fairness hearing to determine whether the proposed settlement agreement was fair. They contend that Appellants had every opportunity to present evidence to contradict or refute the defenses asserted in the pleadings but failed to do so.

Fair Grounds Defendants aver that Appellants failed to cite any law or jurisprudence to support their argument that the trial court lacked authority to approve the proposed settlement agreement because the trial court never considered "justiciable issues," such as whether Fair Grounds Defendants committed conversion. Additionally, Fair Grounds Defendants argue that Appellants possessed the opportunity to present evidence and testimony at the fairness hearing that they believed the trial court should consider. Fair Grounds Defendants note the testimony presented by Appellants consisted of the objectors wanting more money.

Likewise, Class Representatives note the cases relied on by Appellants do not hold that a defendant must file an answer to settle a case. Class Representatives note that Fair Grounds Defendants and HBPA have sought outright dismissal by filing various exceptions. Further, Class Representatives note that Fair Grounds Defendants set forth various defenses in the memorandum filed to support their exceptions. Additionally, Class Representatives aver the trial court was not required to analyze the merits of the claims asserted in the Second Amended Petition.

As we determined earlier, the *Horton* court did not imply or affirmatively state probable cause could not be determined without an answer on file. The *Horton* court indicated:

First, the court conducts a preliminary approval or pre-notification hearing to determine whether the proposed settlement is "within the range of possible approval" or, in other words, whether there is "probable cause" to notify the class of the proposed settlement. . . . [A]ssuming that the court grants preliminary approval and notice is sent to the class, the court conducts a "fairness" hearing, at which all interested parties are afforded an opportunity to be heard on the proposed settlement. The ultimate purpose of the fairness hearing is to determine if the proposed settlement is "fair, reasonable, and adequate."

*Horton*, 855 F.Supp. at 827.

As previously noted, the *Munday* court determined it could grant preliminary approval of the class settlement absent an answer. *Munday*, SACV 15-1629-JLS (KESx), 2016 WL 7655796, at *5. Further, as we earlier stated, the trial court possessed a plethora of pleadings to determine probable cause in this case.

Appellants point to the trial court's reasons for judgment wherein the trial court indicated that it had considered the complete legal and factual issues. Appellants conclude the trial court could not consider the complete legal and factual issues without an answer on file or deposition testimony. However, as detailed above, the trial court possessed sufficient information regarding the defenses of Fair Grounds Defendants and HBPA.[42]

---

[42] Further, the procedural posture of the case indicates that Fair Grounds Defendants sought to have the case dismissed outright by its exceptions and still had a pending exception (the exception of nonjoinder) at the time of the proposed settlement agreement. Based on the procedural posture of the case, Fair Grounds Defendants were not required to file an answer until resolution of the exception. Louisiana Code of Civil Procedure Article 1001 is titled "Delay for Answering" and provides:

A defendant shall file his answer within fifteen days after service of citation upon him, except as otherwise provided by law.

When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, *the answer shall be filed within ten days after the exception is*

Appellants' contention that no depositions were taken is confounding because there is no evidence in the record that Appellants sought to take a single deposition in the six-plus months between the trial court's February 18, 2020 order and the October 7, 2020 fairness hearing. Further, there is no requirement that the parties take depositions prior to approval of a settlement agreement.

Appellants assert that a defendant shall file an answer and admit or deny each allegation in the petition. They claim that if a defendant fails to admit or deny an alleged fact in the petition, the fact is treated as admitted. Appellants cite the Louisiana Civil Law Treatise in support.

Chapter Five of the Louisiana Code of Civil Procedure, which includes Articles 1001 - 1006, is titled "Answer." In particular, La. C.C.P. art. 1004 provides, in pertinent part, that "[t]he answer shall admit or deny the allegations of fact contained in each paragraph of the petition, and all such allegations, other than those as to the amount of damages, are admitted if not denied in the answer." The plain language of the article does not support Appellants' contention that the allegations are deemed admitted absent an answer. Rather, the article clearly provides the allegations are admitted if not denied *in* the answer.

Appellants submit the trial court did not consider whether Fair Grounds Defendants and HBPA committed conversion, conspiracy, breach of fiduciary duties, breach of statutory duties, and invasion of the business interests of

_overruled or referred to the merits, or ten days after service of the amended petition._

The court may grant additional time for answering.

(Emphasis added.)

Plaintiffs. Significantly, the trial court conducted the required fairness hearing during which Appellants possessed the opportunity to present evidence and testimony. Appellants submitted no testimony or evidence to support their claims that Fair Grounds Defendants and HBPA committed conversion, conspiracy, breach of fiduciary duties, breach of statutory duties, and invasion of the business interests of Plaintiffs. The trial court considered the testimony and evidence presented at the fairness hearing. As will be discussed in more detail later in this Opinion, the trial court considered the required factors prior to determining the proposed settlement agreement was fair, reasonable, and adequate. This argument is without merit.

### Issue (B) - Appellees Failed to Prove the Proposed Settlement Agreement was in the Best Interests of the Class

Appellants aver a compromise must be fair, reasonable, and adequate for the class, citing La. C.C.P. art. 594(B). Appellants contend in order to determine whether a compromise is fair, reasonable, and adequate, the court must consider the factors found in the concurring opinion in *Orrill*, 2009-0888, p.16, 38 So.3d at 470 (Belsome, J., concurring). Appellants list those factors as:

(1)   The existence of fraud or collusion behind the settlement;

(2)   The complexity, expense, and likely duration of the litigation;

(3)   The stage of the proceedings and the amount of discovery conducted;

(4)   The probability of Plaintiff's success on the merits;

(5)   The range of possible discovery;[43]

---

[43] Note that in *Orrill*, 2009-0888, p.16, 38 So.3d at 470 (Belsome, J., concurring), this factor is listed as "range of possible recovery"; however, in their brief to this

(6)    The opinions of class counsel, class representatives, and absent

class members;

(7)    The risks of establishing damages;

(8)    The ability of the defendants to withstand a greater judgment;

and

(9)    The range of reasonableness of the settlement fund in light of

[the] best possible recovery.[44]

*(1) The existence of fraud or collusion behind the settlement*

Appellants conclude that the settlement is attorney-driven. They aver that

Class Representatives were uninformed as to their own claims. In particular,

Appellants point to the number of class members not participating in the

settlement. Appellants contend, therefore, that the optics reflect negatively on the

reasons for the push of the proposed settlement.

*(2) The complexity, expense, and likely duration of the litigation*

Appellants contend the case is not complex and merely involves whether

Fair Grounds Defendants owe the class $35,820,731.00. Additionally, Appellants

assert the parties conducted little discovery and normal discovery would allow for

expeditious resolution of the matter.

---

Court, Appellants list this factor as "range of possible discovery" and brief it as
such.

[44] In actuality, the concurrence mentioned the six factors found in in *Reed v.
General Motors Corporation*, 703 F.2d 170, 172 (5th Cir. 1983) and the nine
factors found in *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975). *Orrill*, 2009-
0888, p.16, 38 So.3d at 470 (Belsome, J., concurring). Appellants themselves
combined the factors in their brief to this Court.

*(3) The stage of the proceedings and the amount of discovery completed*

Appellants insist that Fair Grounds Defendants and HBPA have not filed an answer and that the parties only conducted limited discovery. Further, Appellants assert no dispositive motions have been filed since 2018.

*(4) The probability of plaintiffs' success on the merits*

Appellants note that Evangeline Downs conducts racing and has video poker machines. Additionally, Appellants aver Evangeline Downs pays the video poker purse supplement in accordance with La. R.S. 27:438. Further, Appellants submit discovery would bolster the likelihood of success on the merits.

*(5) The range of possible discovery*

Appellants contend glaring questions remain that could be addressed through rudimentary discovery, such as the specifics of insurance coverage; who decided to skip funding the quarter-horse meet; the role of the then-executive director of HBPA, Mr. Alfortish; and whether Fair Grounds Defendants obtained permission from the Commission or the Louisiana Legislature in 2008 to "'skip over' the [q]uarter[-h]orse meet rather than pay the purses like Evangeline Downs does . . . ."

*(6) The opinions of class counsel, class representatives, and absent class members*

Appellants assert that Class Representatives called witnesses who supported the proposed settlement agreement. However, Appellants aver the failure of these witnesses to file a claim defeats their contention. In particular, Appellants point to the testimony of Mr. Salaid, the executive director of LQHBA, who stated that LQHBA encouraged members to support the proposed settlement agreement. Appellants also note that as an owner, Mr. Salaid was eligible to file a claim but

did not. Appellants conclude that Mr. Salaid's failure to file a claim indicates that he did not support the proposed settlement agreement.

Additionally, Appellants assert Mr. Roberts and Mrs. Foreman likewise claimed to support the proposed settlement agreement but did not file a claim properly.

In further support of their argument that the proposed settlement agreement does not meet this factor, Appellants aver Mr. Lavergne stated he no longer supported the proposed settlement agreement because he believed it was not close to what was owed and he would not benefit from additional races as he retired from riding as a jockey. Appellants note Mr. Watson and Mr. Munacy likewise do not support the proposed settlement agreement because it does not provide enough money and they want to continue the litigation. Appellants state Mr. Brossette opposed the proposed settlement agreement because he believed the amount was insufficient and he did not believe a cap should exist on future amounts.

Appellants conclude that Class Representatives failed to submit evidence to prove the proposed settlement agreement was fair, reasonable, or adequate. Additionally, Appellants assert that their witnesses proved the settlement is unfair, unreasonable, and inadequate.

*(7) The risks of establishing damages*

Appellants assert the calculation of damages has not been contested. They contend whether Fair Grounds Defendants and/or HBPA is liable for $35,820,731.00 is a question for the judge or jury.

*(8) The ability of the defendants to withstand a greater judgment*

Appellants note that Fair Grounds Defendants and HBPA did not file an answer. Thus, Appellants aver any evidence, testimony, or pleading which questions Appellees' ability to withstand a greater judgment is not proper.

*(9) The range of reasonableness of the settlement fund in light of the best possible recovery*

Appellants contend the proposed settlement agreement would potentially pay 3% of the amount of the current undisputed video poker purse funds. They submit the proposed settlement agreement caps future video poker funds at one million per year. In conclusion, Appellants argue that the range of settlement funds is not reasonable considering the amount owed.

In their brief, Fair Grounds Defendants contend the trial court is to determine whether a settlement is fair, reasonable, and adequate, citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981). To determine whether a settlement is fair, reasonable, and adequate, Fair Grounds Defendants submit the trial court considers the six factors enunciated in *Reed*:

(1)     [T]he existence of fraud or collusion behind the settlement;

(2)     [T]he complexity, expense, and likely duration of the litigation;

(3)     [T]he stage of the proceedings and the amount of discovery completed;

(4)     [T]he probability of plaintiffs' success on the merits;

(5)     [T]he range of possible recovery; and

(6)     [T]he opinions of class counsel, class representatives, and absent class members.

*Reed*, 703 F.2d at 172.

*1) No existence of fraud or collusion behind the settlement*

Fair Grounds Defendants assert Appellants did not allege, and did not establish, fraud or collusion behind the proposed settlement agreement. Fair Grounds Defendants note that Class Representatives expressed an understanding of the proposed settlement agreement and the reasons it was beneficial to the class. Fair Grounds Defendants aver that Appellants claim that Class Representatives were uninformed and the proposed settlement agreement was attorney-driven, but failed to cite to any portion of the record to support the allegations. To the contrary, Fair Grounds Defendants note that Class Representatives expressed an understanding of the proposed settlement agreement and the reasons that it was beneficial to the class. Regardless, Fair Grounds Defendants contend the false allegations do not suggest fraud or collusion.

*2) The litigation is complex; continued litigation would be costly and time-consuming*

Fair Grounds Defendants argue the case raised numerous complex issues, including whether the Commission possessed jurisdiction; whether Plaintiffs had a right of action; whether the claims are prescribed; whether the claims are barred by the Commission's orders directing the funds be distributed to the thoroughbred races; whether La. R.S. 27:438 provides a civil remedy; whether the claims were barred by the releases claimed in the 2019 Stall Agreement; and whether Plaintiffs had to join the thoroughbred horsemen who received the funds.

Further, Fair Grounds Defendants argue the case requires interpretation of racing and gaming law and regulations. In support of their argument, Fair Grounds Defendants cite *Louisiana Division of Horsemen's Benevolent & Protective Association v. Louisiana State Racing Commission,* 391 So.2d 589 (La. App. 4 Cir.

87

1980), *writ not considered sub nom.*, *Louisiana Division of Horsemen's Benevolent & Protective Association v. Louisiana State Racing Commission*, 397 So.2d 1362 (La. 1981). Therein, this Court recognized that the Louisiana Legislature granted the Commission the "broadest power possible" over the racing industry. *Id.*

Fair Grounds Defendants contend resolution of the remaining issues would have required years more of litigation, in various forums, at a considerable expense.

*3) The stage of the proceedings and the amount of discovery completed support a finding the proposed settlement agreement was fair*

Fair Grounds Defendants aver this factor considers whether the parties have a full understanding of the legal and factual issues at the time the agreement is reached, citing *Manchaca v. Chater*, 927 F. Supp 962, 967 (E.D. Tx. 1996). In support, Fair Grounds Defendants further note a great amount of time on formal discovery is not required, citing *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 211. Additionally, they cite *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7 - 12 Litig.*, 447 F.Supp.2d 612 (E.D. La. 2006). Therein, the court indicated that if the plaintiff has "taken affirmative steps to gather data on the claims at issue, and the terms of the settlement or settlement negotiations are not patently unfair, the Court may rely on counsel's judgment that the information gathered was enough to support a settlement." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7 - 12 Litig.*, 447 F.Supp.2d at 620.

Fair Grounds Defendants contend that Plaintiffs filed the petition over seven years ago, numerous other pleadings have been filed, and the parties engaged in

extensive discovery. Accordingly, Fair Grounds Defendants submit additional discovery would not lead to new "facts" being discovered.

*4) The probability of plaintiffs' success on the merits is slight*

Fair Grounds Defendants note their brief in support filed in the trial court detailed numerous reasons why Appellants would have little chance of success on the merits.[45] In particular, Fair Grounds Defendants aver that Appellants failed to address the merits of any of their asserted defenses. Additionally, Fair Grounds Defendants note that Appellants misinterpret La. R.S. 27:438 and that their interpretation would lead to an absurd result. Further, Fair Grounds Defendants contend La. R.S. 27:438 provides no civil remedy; Appellants' claims are barred by prescription; the Commission ordered funds be distributed to the thoroughbred meet; many in the class signed the 2019 Stall Agreement containing a waiver of the claims; and the owners, trainers, and jockeys accepted the purse listed in the condition books by entering and riding horses in the races set forth in the condition books. Fair Grounds Defendants contend the owners, trainers, and jockeys are thus estopped from asserting entitlement to purses not listed in the condition books.

Fair Grounds Defendants note the only argument on the merits set forth by Appellants is that Evangeline Downs paid video poker purse supplements. However, Fair Grounds Defendants aver Evangeline Downs is not paying video poker purse supplements in the manner provided by La. R.S. 27:438. Rather, according to Fair Grounds Defendants, Evangeline Downs pays video poker purse supplements 70% to thoroughbreds and 30% to quarter-horses, and Evangeline Downs follows the split set forth in the slot machine statute. Fair Grounds

---

[45] Fair Grounds Defendants refer to the Brief in Support of Final Approval and the Reply to Objection to Fairness Hearing.

Defendants note the slot machine statute specifically references thoroughbreds and quarter-horses but La. R.S. 27:438 lacks such a reference.

*5) The range of possible recovery supports a finding the settlement is fair*

In support of satisfaction of this factor, Fair Grounds Defendants cite *In re Heartland Payments Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d 1040 (S.D. Tex. 2012). Therein, the court indicated this factor requires a court to "establish the range of possible damages that could be recovered at trial and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *In re Heartland Payments Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F.Supp.2d at 1067 (quoting *In Re Corrugated Container Antitrust Litig.*, 643 F.2d. 195, 213 (5 Cir. 1981)).

Fair Grounds Defendants argue that Appellants failed to provide a range of recovery or refute the numerous bars to recovery. Instead, Fair Grounds Defendants note that Appellants set forth questions that do not relate to the range of possible recovery. Further, Fair Grounds Defendants aver that in Appellants' brief to this Court, they raise an issue as to the former executive director of HBPA, Mr. Alfortish. Fair Grounds Defendants argue that Appellants did not refer to Mr. Alfortish in the trial court proceedings and may not raise an issue concerning Mr. Alfortish for the first time on appeal.

*6) The opinions of class counsel, class representatives, and absent class members support a finding the settlement is fair*

Fair Grounds Defendants note class counsel support the proposed settlement agreement, as do Class Representatives. Specifically, Fair Grounds Defendants explain that both Mrs. Foreman and Mr. Roberts testified in support of the

90

proposed settlement agreement. Further, Fair Grounds Defendants contend Mrs. Foreman filed a claim that HBPA deemed timely. Fair Grounds Defendants aver Mr. Roberts did not file an individual claim, but is participating in the settlement through the claim filed for his partnership with Jumonville Farms. Additionally, Fair Grounds Defendants contend there is no requirement that Class Representatives participate in a settlement because the consideration for the court is whether the settlement is fair and adequate to the class as a whole.

Next, Fair Grounds Defendants submit the evidence demonstrated the absent class members support the proposed settlement agreement. They note HBPA mailed 3,567 notices, and the USPS returned three or four as undeliverable. Fair Grounds Defendants submit HBPA received 179 claim forms representing 250 accounts timely. The value of the claims totaled $4,610,062.00. Fair Grounds Defendants also note HBPA deemed twenty-six claim forms representing thirty-three accounts incomplete. In contrast, Fair Grounds Defendants point out that the clerk of court received only one opt-out form timely, along with two incomplete opt-out forms. The value of the claim of the individual who opted out totaled $12,968.49. Further, Fair Grounds Defendants note HBPA received only ten objections with a value of $534,434.56.

The Fair Grounds defendants point to the testimony of Mr. Salaid, the Executive Director of LQHBA, and Mr. Robichaux, the President of LQHBA. Both Mr. Salaid and Mr. Robichaux testified in support of the proposed settlement agreement. Mr. Robichaux specified the proposed settlement agreement was "very, very beneficial to us."

Fair Grounds Defendants also point to the witnesses called by Appellants. Specifically, Fair Grounds Defendants note Mr. Lavergne and Mr. Watson are

jockeys, not horsemen pursuant to La. R.S. 4:143. Thus, Fair Grounds Defendants contend Mr. Lavergne and Mr. Watson are not entitled to receive purse funds. Rather, Fair Grounds Defendants submit the owners pay the jockeys from the owners' purse proceeds and inherently represent the jockeys.

Additionally, Fair Grounds Defendants contend Mr. Lavergne signed the proposed settlement agreement and did not file an objection to the proposed settlement agreement. Fair Grounds Defendants aver the doctrine of estoppel prevents Mr. Lavergne from objecting to the proposed settlement agreement that he signed. In support, Fair Grounds Defendants cite *Lowman v. Merrick*, 2006-0921 (La. App. 1 Cir. 3/23/07), 960 So.2d 84. Therein, the court explained:

> [T]he doctrine of judicial estoppel prohibits parties from deliberately changing positions according to the exigencies of the moment. The doctrine is intended to prevent the perversion of the judicial process and prevents "playing 'fast and loose with the courts.'" *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 1814-1815, 149 L.Ed.2d 968 (2001) (quoting *Stretch v. Watson*, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949), *rev'd in part*, 5 N.J. 268, 74 A.2d 597 (1950)).

*Lowman*, pp.12-13, 960 So.2d at 92.

Fair Grounds Defendants argue even if the trial court considered Mr. Lavergne's objection, he and the others testified they should receive the money owed to them. Fair Grounds Defendants contend no settlement pays everything, especially in a case where the claims are legally and factually baseless. Additionally, Fair Grounds Defendants note that Appellants did not complain about the purses at the time of the race. Further, Fair Grounds Defendants argue that Appellants did not explain why they did not opt-out of the settlement if they did not like the terms.

Fair Grounds Defendants aver the fact that ninety percent or more of the class members did not file a claim does not establish that those class members disapproved of the proposed settlement agreement. Rather, Fair Grounds Defendants contend the failure to submit a claim more likely reflects indifference or disagreement with the position of the Appellants. That is, Fair Grounds Defendants suggest the industry standard is to enter a race based on the condition book and accept the purse offered therein. Further, Fair Grounds Defendants note the response rate is within, and even above, the range of responses in other class action cases where the court found a settlement to be fair, adequate, and reasonable. They cite several cases in support including *Duncan v. JPMorgan Chase Bank N.A.*, SA-14-CA-00912-FB, 2016 WL 4419472 *6 (W.D. Tex. 5/24/16)(22.8% response rate determined to be "extremely high participation rate"); *In re Pool Products Distribution Mkt. Antitrust Litig.*, MDL 2328, 2015 WL 3486434 *7 (E.D. La. 6/2/15)(settlement approved with 2.3% response rate); and *Touhey v. United States*, EDCV 08-01418-VAP, 2012 WL 3179036 *7 (C.D. Cal. 7/25/11)(2% response rate deemed muted but positive and weighed in favor of approval of settlement).

In their brief, Class Representatives first note the duty owed by class counsel is to the class and not to the special desires of named plaintiffs. *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982). "It has been held that agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable." *Parker*, 667 F.2d at 1211. "[T]he named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands." *Id*.

Similar to Fair Grounds Defendants, Class Representatives submit the trial court considers the six factors enunciated in *Reed.* Class Representatives contend application of the six factors support approval of the settlement.

*1) No existence of fraud or collusion behind the settlement*

Class Representatives aver the record proves the length and veracity of the litigation. They note the parties fought various issues in three forums over numerous years prior to reaching a proposed settlement agreement.

*2) The complexity, expense, and likely duration of the litigation*

Class Representatives note the purpose of settlement is to avoid the delay and uncertainty of trial, citing *Jenkins v. Trustmark National Bank*, 300 F.R.D. 291, 303 (S.D. Miss. 2014). They aver significant uncertainty exists regarding the ultimate interpretation of La. R.S. 27:438. Further, Class Representatives note issues regarding the 2019 Stall Agreement and the exception of nonjoinder remain.

*3) The stage of the proceedings and the amount of discovery completed*

Class Representatives note the jurisprudence requires that counsel have an adequate appreciation of the merits before negotiating, citing *Moore v. Halliburton Co.*, 2004 WL 2092019 at *7 (N.D. Tex. 9/9/04). "The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler v. Jacobson*, 822 F.Supp. 1551, 1555 (M.D. Fla.1992).

Additionally, Class Representatives submit class counsel engaged in a reasonable amount of discovery. In particular, Class Representatives note the parties filed over 150 pleadings in the various forums. Hence, Class Representatives conclude class counsel possessed an adequate appreciation of the merits prior to engaging in settlement negotiations.

*4) The probability of plaintiffs' success on the merits*

Under this factor, Class Representatives note several risks are associated with continuing the litigation and not settling. Specifically, Class Representatives contend the risks arise due to the uncertainty of the interpretation of La. R.S. 27:438; the difficulty in maintaining a class given the waiver contained in the 2019 Stall Agreement; the difficulty in claims for future purse supplements if Fair Grounds Defendants succeed in moving the race dates; a delay caused by Fair Grounds Defendants' pending exception of nonjoinder; and the difficulty in proceeding before the Commission that ordered Fair Grounds Defendants to pay the video poker purse supplement funds to the thoroughbred meet.

Class Representatives contend the litigation will continue for several years absent the proposed settlement agreement. Considering the risks, factually and legally, Class Representatives aver the settlement is fair. In support, Class Representatives cite *Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984). Therein, the court noted the plaintiffs faced a myriad of factual and legal problems. *Bennett*, 96 F.R.D. at 349. The court found "the likelihood of success on the merits in this case is very low. It would seem unwise, therefore, to risk the substantial benefits which the settlement confers upon the class to the vagaries of a trial." *Id.*, 96 F.R.D. at 350.

*5) The range of possible recovery*

Class Representatives cite *Parker* in support of their argument under this factor. In *Parker*, the court indicated a proposed settlement may amount to a fraction of the potential recovery and not be grossly inadequate and subject to disapproval. *Parker*, 667 F.2d at 1209-1210, fn.6 (*quoting City of Detroit v. Grinnett Corp.*, 495 F.2d 448, 455 (2d Cir. 1974)). "In fact there is no reason, at

least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id*. (quoting *City of Detroit*, 495 F.2d at 455, n.2).

In particular, Class Representatives note the petition asserted claims for past due and future funds. They contend that Fair Grounds Defendants asserted numerous defenses to the past due funds of $35,820,731.00. Additionally, Class Representatives admit the settlement agreement provides one million dollars to satisfy past due claims.

As for the future, Class Representatives note that Fair Grounds Defendants sought to move the dates of the quarter-horse meet. If successful, there would be no video poker purse supplemental funds for quarter-horse meets according to Appellants' interpretation of La. R.S. 27:438. The proposed settlement agreement guarantees 12.5% of the video poker funds, up to one million dollars, indefinitely, regardless of the quarter-horse race dates. Further, the proposed settlement agreement provides five additional days of racing for quarter-horses.

*6) The opinions of class counsel, class representatives, and absent class members*

Class representatives note the jurisprudence provides the opinion of class counsel should be accorded great weight when the court evaluates a proposed settlement, citing *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632, 649 (N.D. Tex. 2010). In particular, Class Representatives observe that class counsel argued in favor of the proposed settlement agreement in the memorandum in support of settlement filed on September 21, 2020, in which they opine no better result is available through litigation. Class Representatives also point to their own testimony in support of the proposed settlement agreement.

*7. Fairness of attorneys' fees*

In their discussion regarding this factor, Class Representatives acknowledge that Appellants did not directly challenge the amount of attorneys' fees on appeal. As the court retains authority to review and approve attorneys' fees pursuant to La. C.C.P. art. 594, Class Representatives contend the attorneys' fees are fair considering the amount of money involved, the skill of the attorneys, and the amount of work necessarily undertaken, citing *Jungeblut v. Parish of Jefferson*, 485 So.2d 974, 979 (La. App. 5 Cir. 1986). Class Representatives aver class counsel worked over 1,650 hours since 2014 and expended $34,000.00 in costs. Further, Class Representatives contend the amount of the attorneys' fees, $787,500.00, will not be paid from the settlement; rather, it is in addition to the settlement funds.

We note court approval is necessary to compromise or settle a class action. La. C.C.P. art. 594(A)(1). The compromise or settlement must be fair, reasonable, and adequate for the class. La. C.C.P. art. 594(B). No reported decision by a Louisiana state court sets forth a specific method for determining whether a compromise or settlement is fair, reasonable, and adequate. As noted earlier, this Court indicated Louisiana courts are guided by Federal Rule of Civil Procedure 23 and jurisprudence interpreting same. *Pollard*, 2010-0788, p.10, 102 So.3d at 79. Federal Rule of Civil Procedure 23 requires court approval to settle a class action and specifies:

> (2) Approval of the Proposal. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> > (A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

Various federal circuits developed factors to determine whether a settlement is fair, reasonable, and adequate. Appellants suggest this Court should apply a combination of the nine factors announced by the Third Circuit in *Girsh* and the six factors announced by the Fifth Circuit in *Reed*. In contrast, Class Representatives and Fair Grounds Defendants contend this Court should only apply the six factors announced by the Fifth Circuit in *Reed*. Notably, the factors utilized by all circuits tend to overlap.[46]

---

[46] For instance, the United States Court of Appeal, First Circuit, declared:

> The case law offers 'laundry lists of factors' pertaining to reasonableness, but 'the ultimate decision by the judge involves balancing the advantages and disadvantages of the proposed settlement as against the consequences of going to trial or other possible but perhaps unattainable variations on the proffered settlement.' *Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 44 (1st Cir.2009). 'If the parties negotiated at arm's length and conducted sufficient discovery, the district court must presume the settlement is

A review of the factors announced in *Reed* reveals they more closely align

with the language found in Federal Rule of Civil Procedure 23(e).  Further, the

---

reasonable. *In re Pharm. Indus. Average Wholesale Price Litig.*, 588
F.3d 24, 32-33 (1st Cir.2009).

*Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 82 (1st Cir. 2015).

On the other hand, the United States Court of Appeals, Second Circuit, utilizes nine factors, as does the United States Court of Appeals, Third Circuit.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005).  The nine factors include:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart Stores, Inc.*, 396 F.2d at 117.

The United States Court of Appeals, Fourth Circuit, determines fairness by looking at whether the negotiations were conducted at arms' length and considering whether:

> The district court's assessment of the adequacy of the settlement was likewise based on . . . (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.

*In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991).

The United States Supreme Court has not issued an opinion on this matter. Presumably, the United States Supreme Court has not done so as there is no real dispute between the circuits considering the factors announced by the various circuits overlap.

United States Court of Appeals, Fifth Circuit, oversees appeals from all of the federal district courts in Louisiana. Thus, we will utilize the factors announced in *Reed* to determine whether the proposed settlement agreement herein is fair, adequate, and reasonable.

*1) The existence of fraud or collusion behind the settlement*

The federal jurisprudence reveals a protracted period of litigation prior to settlement is evidence of a lack of fraud or collusion. *See Jones v. Gusman*, 296 F.R.D. 416, 467 (E.D. La. 2013).

Appellants assert the proposed settlement agreement was attorney-driven and claimed the Class Representatives being uninformed of their own claims proved the settlement was attorney-driven.

The testimony and evidence presented at trial reveal that Class Representatives submitted claims and supported the proposed settlement agreement. Further, the record reveals a protracted period of litigation prior to settlement. The parties litigated this case over six years before the Commission, the trial court, and this Court. Fair Grounds Defendants filed exceptions seeking outright dismissal of the claims asserted in the petition. Class Representatives testified that Plaintiffs won some battles and lost some battles, as is demonstrated by the voluminous record. Notably, even Mr. Brossette agreed after learning the terms of the proposed settlement agreement, that Plaintiffs discussed the settlement amongst themselves. There is no evidence class counsel pressured any plaintiff to settle, or engaged in fraud or collusion. The record does not support Appellants' argument. Thus, this factor supports approval of the proposed settlement agreement.

*2) The complexity, expense, and likely duration of the litigation*

In analyzing this factor, the trial court may consider "the time and money the litigants will save, and the savings the judicial system will realize, if the settlement is approved - evaluating whether settling avoids the 'risks and burdens of potentially protracted litigation.'" *In re Train Derailment Near Amite Louisiana*, CIV.A. MDL NO. 1531, 2006 WL 1561470, at \*21 (E.D. La. May 24, 2006) (*quoting Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004)).

Appellants aver this case involves damages that are not disputed and contends it is not complex. They assert the parties conducted little discovery and there was no fact witness testimony, no expert testimony, and no depositions.

However, Appellants failed to present evidence they attempted to conduct any discovery. Appellants and Appellees both presented fact witnesses at the fairness hearing; yet Appellants neglect to explain how expert testimony would have helped the trial court understand an issue in the case.

Notably, this matter involves consideration of complex racing and gaming statutes and regulations, including interpretation of La. R.S. 27:438. At the time of its adoption, the Fair Grounds conducted no quarter-horse races. The Commission approves the condition books that state the amount of the purse offered and the sources of the purse funds. The Commission knew that Fair Grounds Defendants and Evangeline Downs paid video poker funds differently. After the litigation commenced, the Commission ordered Fair Grounds Defendants to pay the disputed video poker funds to the thoroughbred meet. Absent settlement, the duration of the litigation might be considerable. For example, Fair Grounds defendants seek to join the thoroughbred horsemen who won races during 2008 through 2019 and received the disputed video poker supplement purse funds. Additionally, Fair

Grounds defendants assert numerous defenses in the pleadings including prescription, waiver based on the 2019 Stall Agreement, and estoppel based on the Commission's orders. Thus, the matter is complex. Further, continued litigation would be expensive to the litigants and time-consuming to the trial court.

The record does not support Appellants' argument. Thus, this factor supports approval of the proposed settlement agreement.

3) *The stage of the proceedings and the amount of discovery completed*

This factor requires the district court to "determine whether the parties are in a position to assess their respective cases and to make reasonable decisions with respect to settlement, considering the information to which they are privy and the stage of the proceedings when the tentative deal is struck." *In re Train Derailment Near Amite Louisiana*, CIV.A. MDL NO. 1531, 2006 WL 1561470, at *22.

Appellants assert that Fair Grounds Defendants and HBPA have not filed an answer, the discovery conducted has been limited, and no dispositive motions have been filed since 2018.

However, Class Representatives introduced evidence that the parties engaged in discovery, including responses to requests for admissions, responses to first set of interrogatories, and responses to requests for production of documents. The parties filed over 150 pleadings between the proceedings conducted before the Commission, the district court, and this Court over six-plus years. The parties are in a position to assess their cases and make reasonable decisions with respect to the proposed settlement agreement.

On February 18, 2020, the trial court granted preliminary approval of the proposed settlement agreement. The trial court held the fairness hearing on October 7, 2020, and November 17, 2020. Accordingly, Appellants possessed

time to conduct discovery and the ability to do so. *See* Kent A. Lambert, *Class Action Settlements in Louisiana*, 61 LA. L. REV. 89, 116 (2000) (noting that "objectors are entitled, as a general matter, to pursue reasonable discovery necessary for them fully to evaluate and address a proposed settlement"). There is no evidence that Appellants conducted any discovery, despite the opportunity to do so.

Accordingly, the record does not support Appellants' argument. Thus, this factor supports approval of the proposed settlement agreement.

*4) The probability of plaintiffs' success on the merits*

This factor requires the trial court to determine:

> [W]hether the 'relief' provided to the class in the compromise agreement being considered is 'adequate' in light of the strengths and weaknesses of the plaintiffs' case. If rejection of the proposed settlement and resort [to] further litigation is unlikely to lead to a far greater relief for the class than the relief provided in the proposed compromise agreement, then this *Reed* factor weighs in favor of the proposed settlement. *Ayers*, 358 F.3d at 373.

*In re Train Derailment Near Amite Louisiana*, CIV.A. MDL NO. 1531, 2006 WL 1561470, at *23.

Appellants aver that Evangeline Downs pays video poker purse supplements according to the statutory language, but the Fair Grounds does not. They contend the court must decide the discrepancy between the methods of payments. To this end, Appellants claim rudimentary discovery would bolster the likelihood of their success on the merits.

However, Appellants' argument ignores the testimony that Evangeline Downs pays video poker purse supplements to both thoroughbred and quarter-horse meets utilizing the percentage split provided in La. R.S. 27:361. Mr. Fenasci explained Evangeline Downs pays 70% of video poker proceeds to the

thoroughbred meet and 30% to the quarter horse meet. Louisiana Revised Statutes 27:361 provides that the racetracks with slot machines shall pay a percentage of proceeds to horse races, with 70% going to the thoroughbred meet and 30% going to the quarter-horse meet. Louisiana Revised Statutes 27:438 does not provide for a percentage split of video poker proceeds. Thus, Evangeline Downs does not pay video poker purse supplements according to Appellants' interpretation of La. R.S. 27:438.

Appellants insist the trial court is unable to weigh the probability of their success absent an answer on file. As we previously indicated, this contention lacks merit.

At first glance, a plain reading of La. R.S. 27:428 supports Appellants' argument. However, at the time La. R.S. 27:438 passed, the Fair Grounds solely sponsored thoroughbred races. Appellants ignore the unrefuted testimony of the Honorable Mr. Morrell, a member of the Louisiana Legislature at the time of the passage of La. R.S. 27:438.[47] Mr. Morrell testified he authored, or co-authored, every bill pertaining to horse racing during his tenure in the Louisiana Legislature, including La. R.S. 27:438. He stated La. R.S. 27:438 was to supplement the purses of thoroughbred races at the Fair Grounds.

Notably, by law, the Fair Grounds holds eighty thoroughbred race days and ten quarter-horse race days. Fair Grounds Defendants noted quarter-horse races account for less than 1% of bets placed at its facilities. Fair Grounds Defendants aver it would be absurd to award nearly half of the video poker purse supplements

---

[47] Similarly, in *Orrill*, this Court noted class counsel presented witnesses at the fairness hearing who testified to the defenses that would be presented at a trial on the merits, i.e., if the court did not approve the settlement. 2009-0888, p.10, 38 So.3d at 463.

to the quarter-horse meet when the quarter-horse meet is merely ten days and accounts for less than 1% of bets placed at its facilities.

Further, this is not an instance wherein Fair Grounds Defendants converted the funds to their own use. Fair Grounds Defendants instead paid the disputed video poker funds to thoroughbred meets. Significantly, after the filing of the Petition and with full knowledge of Plaintiffs' claims, the Commission ordered video poker funds to be paid to the thoroughbred meet. Thus, it is unlikely a court would award the entirety of the $35,820,731.00 to Plaintiffs.

While recognizing there is some validity to the arguments of Appellants and Appellees, courts need not determine the precise merits of the claims asserted in the petitions and the defenses thereto because the point of settlement is to avoid trial. *See Reed*, 703 F.2d at 172 (recognizing the court is not to try the case), and *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632, 648 (N.D. Tex. 2010) (while the court weighs the facts and law, the court should not reach conclusions as to the ultimate merits of the claims and defenses). Thus, while recognizing the validity of the claims and defenses, this Court is not reaching a conclusion as to the ultimate merits thereof.

Nonetheless, when considering the various defenses, it would be unwise "to risk the substantial benefits which the settlement confers upon the class to the vagaries of a trial." *Bennett*, 96 F.R.D. at 350. This factor supports approval of the settlement.

*5) The range of possible recovery*

This factor requires the Court to determine whether the proposed settlement agreement reflects "a fair, reasonable, and adequate estimation of the value of the case considering what might or could happen at trial." *In re Train Derailment*

*Near Amite Louisiana,* CIV.A. MDL NO. 1531, 2006 WL 1561470, at \*24. "The fact that a proposed settlement . . . only amount[s] to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disproved." *Parker*, 667 F.2d at 1201, n. 6 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2nd Cir. 1974)).

Appellants simply aver the settlement would pay a mere 3% of the undisputed amount of unpaid purse funds. Nonetheless, considering what might happen at trial in light of the numerous defenses asserted by Fair Grounds Defendants as detailed above, the proposed settlement agreement is a fair, reasonable, and adequate estimation of the value of the case. The class will receive one million dollars for past due claims (25% paid yearly out of the video poker proceeds for four years), have guaranteed funds for future races, and have additional racing dates at the Fair Grounds. Significantly, the proposed settlement agreement also clarified that quarter-horse meets will receive 30% of video poker proceeds at other Louisiana racetracks besides the Fair Grounds. Further, if the Fair Grounds moves the race dates, the quarter-horse meet would receive the same payout. The Louisiana Legislature amended La. R.S. 27:438 to reflect the pertinent terms of the proposed settlement agreement so that it will take an act of the legislature to change the guaranteed percentage of video poker proceeds or the number of quarter-horse race days.[48]

In their brief to this Court, Appellants reference the role of Mr. Alfortish, the then-executive director of HBPA in 2008 when the Fair Grounds began hosting quarter-horse races. However, Appellants did not mention the role of Mr. Alfortish

---

[48] This Court recognizes that the Louisiana Legislature conditioned the amendment on a final judgment approving the settlement.

until after trial in their post-hearing brief. This Court recently indicated "[i]t is well-established that appellate courts will not consider issues raised for the first time on appeal, which are not pleaded in the court below and which the trial court has not addressed." *Watson v. Woldenberg Vill., Inc.*, 2020-0453, p.6 (La. App. 4 Cir. 7/7/21), __ So.3d __, 2021 WL 2820469 at *3. As Appellants did not raise the issue of Mr. Alfortish's role in the trial court timely, Mr. Alfortish's role will not be considered by this Court. Further, Appellants failed to make clear how the role of Mr. Alfortish relates to the range of possible recovery.

This factor supports approval of the settlement.

*6) The opinions of class counsel, class representatives, and absent class members*

In *Klein*, the district court noted:

> The Fifth Circuit has repeatedly stated that the opinion of class counsel should be accorded great weight. Recognizing that various class members may have different priorities in a class action, the Fifth Circuit has concluded:

>> Where there is disagreement among the class members concerning an appropriate course of action, it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole. If the attorney's decision in the face of such disagreement affects each class member more or less equally, and no allegation is made that the rights of a definable minority group within the class were sacrificed for the benefit of the majority, the attorney's views must be accorded great weight, and the trial judge's decision to ratify the attorney's action will seldom be overturned.

*Klein*, 705 F.Supp.2d at 649 (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d F.2d 1157, 1216 (5th Cir. 1978)).

In this instance, class counsel submitted a brief prior to the fairness hearing detailing support for the proposed settlement agreement, as well as a post-hearing

brief. Class counsel has participated in this litigation since 2014. The proposed settlement agreement will affect each class member more or less equally.

Appellants contend Mr. Roberts did not file a claim and did not know how much his claim was potentially worth. Notably, Mr. Roberts testified he knew Mr. Jumonville submitted claim forms on behalf of the partnership in which Mr. Roberts is a partner. Further, Mr. Roberts acknowledged he supported the proposed settlement agreement even if he would not participate individually in the million dollars for past due claims. He indicated the settlement was not about him, but about helping all horsemen. Mr. Roberts explained that he attended proceedings before the Commission and the district court and that he knew the Plaintiffs won some battles and lost some battles.

Mrs. Foreman testified in support of the proposed settlement agreement. The trial court commented on Mrs. Foreman's enthusiasm for the additional race dates. Appellants contend Mrs. Foreman did not file a claim timely; however, Mrs. Foreman testified she executed her claim form on August 1, 2020, in the office of class counsel and watched class counsel walk out of the office to place the envelope in the mail. Mr. Fenasci stated HBPA received Mrs. Foreman's claim timely. Nonetheless, Mrs. Foreman indicated if HBPA denied her claim, she still supported the proposed settlement agreement. Mrs. Foreman testified the proposed settlement agreement was in the best interest of Louisiana horsemen.

Additionally, class counsel presented the testimony of Mr. Robicheaux who testified the proposed settlement agreement would be very beneficial to quarter-horse racing. Mr. Robicheaux indicated he understood the terms of the proposed settlement agreement and knew the disputed funds totaled thirty-five million. He asserted quarter-horse purses would increase by forty to fifty percent. Additionally,

Mr. Robicheaux noted the memorandum sent to the 1,700 members of the LQHBA requested its members: "****PLEASE DO NOT OPT OUT OF SETTLEMENT****."

Mr. Salaid, the executive director of LQHBA, likewise testified in support of the proposed settlement agreement. He averred the additional purse funds and additional race days were significant to quarter-horse racing. Further, Mr. Salaid indicated LQHBA first raised the issue of the video poker proceeds in 2013 and was very aware of the situation.

Appellants point to the testimony of Mr. Lavergne, an original plaintiff who objected to the proposed settlement agreement. However, Mr. Lavergne actually signed the proposed settlement agreement and did not file an objection form timely.

In *Lowman v. Merrick*, 2006-0921, pp. 12-13 (La. App. 1 Cir. 3/23/07), 960 So.2d 84, 92, the First Circuit Court of Appeal explained:

> The doctrine of judicial estoppel prohibits parties from deliberately changing positions according to the exigencies of the moment. The doctrine is intended to prevent the perversion of the judicial process and prevents "playing 'fast and loose with the courts.'" *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 1814-1815, 149 L.Ed.2d 968 (2001) (quoting *Stretch v. Watson*, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949), *rev'd in part*, 5 N.J. 268, 74 A.2d 597 (1950)).

Initially, Mr. Lavergne executed the proposed settlement agreement, indicating approval of its terms. During the fairness hearing, Mr. Lavergne claimed he no longer approved of the proposed settlement agreement. While Mr. Lavergne's change of heart might have resulted from an error, Mr. Lavergne may not "play fast and loose" with the courts by deliberately changing his position according to the exigency of the moment. That is, Mr. Lavergne stated his attorney told him he would only receive $250.00 from the settlement. However, according

109

to HBPA, if Mr. Lavergne had submitted a claim form timely, he would have been entitled to approximately 21.69% of $113,377.56 ($24,591.59).

Appellants note Mr. Watson, a jockey, and Mr. Munacy, a trainer, testified they did not support the proposed settlement agreement. Mr. Watson and Mr. Munacy claimed the proposed settlement agreement did not provide the money they are owed for risking their lives. Likewise, Appellants point to Mr. Brossette's testimony wherein he objected to the proposed settlement agreement. Mr. Brossette indicated he objected because a million dollars was not sufficient for the past claims and because he did not like the cap on future payments.

Notably, the trial court's reasons for judgment indicated it was not impressed with the testimony of the objectors. This Court has long noted "[t]he trial court sitting as a trier of fact is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error." *Patterson v. Charles*, 2019-0333, p.9 (La. App. 4 Cir. 9/11/19), 282 So.3d 1075, 1082. In this instance, all of the testimony of Appellants focused on what they believed Fair Grounds Defendants and HBPA owed them individually, though Mr. Brossette did also state he did not like the cap on future payments. Yet, Appellants presented no testimony or evidence to support their interpretation of La. R.S. 27:438 and the claim of entitlement to more money. In contrast, Class Representatives and their witnesses focused on the benefits to the racing industry, and the class, as a whole. Fair Grounds Defendants presented the testimony of Mr. Morrell, who testified La. R.S. 27:348 was to provide funds to the thoroughbred meets at the Fair Grounds at the time of its adoption. Further, while Mr. Watson and Mr. Munacy claimed they wanted to continue with the litigation, they did not opt-out of the settlement. Had Mr. Watson and Mr. Munacy opted out

110

of the settlement, they could have continued litigating their individual claims against Fair Grounds Defendants and HBPA. Instead, Mr. Watson and Mr. Munacy elected to object to the proposed settlement agreement.

Additionally, Appellants point out that Mr. Roberts did not know the value of his claim. Mr. Roberts possessed individual and joint claims. That Mr. Roberts did not know the value of his claims is not surprising. Further, Appellants ignore that Mr. Lavergne believed he would only receive $250.00, according to his attorney, when the value of his claim totaled $113,377.56 and entitled him to approximately $24,591.59. Similarly, Mr. Watson agreed the value of his claim totaled $124,912.63, but testified he did not know he would have received approximately $25,000.00 had he submitted a claim form.

The record reveals the trial court did not err in making its credibility determinations. Thus, this Court will not disturb the trial court's credibility determinations.

As for the absent class members, HBPA received 179 claim forms representing 250 accounts with a value of $4,610,062.00, plus twenty-six incomplete claim forms. HBPA received one completed opt-out form, plus two incomplete forms. HBPA also received ten objections with a value of $534,434.56. However, courts have approved settlement agreements with a lower percentage of participation. *See, e.g.*, *In re Pool Products Distribution Mkt. Antitrust Litig.*, MDL 2328, 2015 WL 3486434, at *7 (E.D. La. June 2, 2015) (approving settlement agreement with a 2.3% claim rate) and *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167, 169 (W.D. La. 1997), *aff'd*, 137 F.3d 844 (5th Cir. 1998) (settlement agreement approved with a response rate of 4.3%).

The 5.4% response rate in this case is more than adequate to support approval of the settlement agreement.

Moreover, a larger number of objectors would not prohibit approval of the proposed settlement agreement. In *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 891 (7th Cir. 1985), the court approved a settlement agreement when the objectors totaled just under fifteen percent. Therein, the Court noted:

> The only case of which we are aware in which the number of objectors was the key factor in reversing approval of a decree is *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). In that case, approximately seventy percent of the relevant subclass objected to a back pay settlement. The court acknowledged that district courts could approve a decree despite a large number of objectors, *id.* at 1215, 1217, but, under the circumstances, concluded that the number of objectors indicated that there was something unfair about the decree, *id.* at 1216, 1218. In opposition to *Pettway* stand *Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir.1983), and *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456 (2d Cir.1982), in which forty percent and fifty-five percent, respectively, of the affected claimants objected, but the courts still affirmed the district courts' approval of the decrees. These cases established that, without more, a large number of objectors will not result in the reversal of a district court's approval of a consent decree.

*Hiram Walker & Sons, Inc.*, 768 F.2d at 891-92.

Herein, Appellants did not reach a forty, fifty-five, or seventy percent objection rate. They allege entitlement to more money, but failed to present evidence to support their claim, and failed to present testimony or evidence to refute that presented by Class Representatives and Fair Grounds Defendants.

Appellants contend more than ninety percent of the class did not file a claim. Any contention the members of the class who did not submit a claim, objection, or opt-out form disapprove of the settlement is conjecture. Appellants failed to submit evidence to support the allegation that a failure to submit a claim form equals disapproval of the settlement. Notably, Appellants possessed the

opportunity to question Mr. Salaid and Mr. Robicheaux as to why they did not submit a claim form but failed to do so. As Fair Grounds Defendants argue, it is equally plausible that failure to submit a form equals indifference or even disagreement with the lawsuit (because horsemen enter races based on the condition book and receive the purses stated therein). In this case, the low number of objections and members who opted out compared to the number of claim forms received indicates approval of the proposed settlement agreement from the absent class members.

The testimony and evidence reveal class counsel, Class Representatives, and absent class members support the settlement. Thus, this factor favors approval of the proposed settlement agreement.

Considering the application of the *Reed* factors, we find the compromise or settlement is fair, reasonable, and adequate for the class. This assignment is without merit.

### *Issue (C) - The Class Notice Was Inadequate and Deficient*

Appellants again contend the notice of the proposed settlement agreement sent to the class was deficient because it lacked the information required by *Sprint*. For the reasons described in 2021-CA-0022, Assignment of Error No. 3, we find this contention without merit.

Appellants assert only 5.4% of the class submitted any response. Appellants conclude the fact that more than 90% of the class did not file a claim raises questions about the notice and the methods of responding during the pandemic.

Additionally, Appellants aver a major concern in class action proceedings is communication between the class and the court. They contend the court should develop appropriate means to provide information to and handle inquiries from the

113

members of the class. They conclude the notice herein deprived the class of its right to weigh involvement in the proposed settlement agreement.

In their brief to this Court, Fair Grounds Defendants assert the class notice was not defective. Instead, Fair Grounds Defendants note the class notice sent out in this case was very detailed and included all information required by La. C.C.P. art. 594.

Class Representatives contend HBPA prepared spreadsheets listing the names and addresses of the owners, trainers, and jockeys who won a quarter-horse race since 2008. HBPA mailed 3,567 notices utilizing the spreadsheets. Class Representatives note USPS returned four notices as undeliverable. One individual opted out, ten individuals objected, and 179 claims form representing 250 HBPA accounts were submitted timely.

Additionally, Class Representatives aver the notice contained all of the information required by law. They contend the notice defined the class, described the settlement terms, the payout procedure, informed the class of the right to opt-out or object and the process to do so, and informed the class of the date of the fairness hearing. In conclusion, they state the notice was reasonably calculated to apprise interested parties of the action and afford them an opportunity to present any objections.

As previously discussed, the notice included all of the information required by La. C.C.P. arts. 591 and 594. Further, Appellants failed to cite to any jurisprudence to support their argument that the low number of responses renders the notice defective due to confusion. We previously indicated courts frequently approve settlement agreements with a lower response rate. Appellants presented no evidence that the notice or the COVID-19 pandemic confused a single member

of the class. The reasons why a potential member of a class may elect not to submit a claim form are too numerous to conclude that a failure to respond results from any particular reason. Significantly, the notice did not confuse Appellants or the 179 individuals who did file claims. That is, Appellants submitted their objections timely, as did the 179 class members submitting claims forms. This argument lacks merit.

### *Issue (D) - The Deadlines to Object, Opt-Out, and Opt-In Have Yet to Run*

Appellants repeat their argument that the Governor's Proclamations and the Supreme Court's orders pertaining to the COVID-19 pandemic vacated and set aside the deadlines to object, opt-out, and opt-in. They suggest that a class member may not have received a notice sent to a business address or post office box because people were told to stay home. Thus, Appellants conclude the court conducted a fairness hearing without the class receiving the required notice of its right to opt-out or object.

Additionally, Appellants contend the mailing of the second notice, which advised the class of the new date of the fairness hearing, added to the confusion of the class. They point to the testimony of Mr. Roberts and contend he had no idea how to proceed with his claim form because of the situation brought on by COVID-19.

In response, Fair Grounds Defendants aver the plain language of the Governor's Proclamations and the Supreme Court orders did not supersede or vacate any deadline but extended certain legal deadlines. They note that the Louisiana Legislature enacted Louisiana Act 162 of 2020 and specifically extended all legal deadlines impacted by the Governor's Proclamations to July 6, 2020.

Louisiana Revised Statutes 9:5829(A) provides the time periods were suspended or extended through July 5, 2020, and expired on July 6, 2020.

Fair Grounds Defendants also aver Appellants' reliance upon Mr. Roberts' testimony to support its argument is misplaced. Instead, Fair Grounds Defendants note Mr. Roberts stated he relied on the claim filed by Mr. Jumonville.

In their brief to this Court, Class Representatives aver that Appellants raised this issue in a motion for clarification or continuance. They contend that Appellants abandoned the motion after filing the Second Amended Petition.

Additionally, Class Representatives argue the plain language of Louisiana Act 162 of 2020 does not support Appellants' argument. Instead, Class Representatives contend that Louisiana Act 162 of the 2020 legislative session extended all deadlines in the Governor's Proclamations to July 6, 2020. Class representatives assert Louisiana Act 162 of 2020 did not vacate the deadlines; rather, it extended the deadlines to opt-out or object to July 6, 2020.

As previously discussed, the Governor's Proclamations and the Supreme Court's orders did not vacate or supersede the deadlines contained in the February 18, 2020 order. The Governor's Proclamation provided that legal deadlines were suspended.[49] The Louisiana Legislature codified the Governor's Proclamations and proclaimed all prescriptive periods during March 17, 2020, through July 5, 2020, shall be subject to a limited suspension or extension and expire on July 6, 2020. *See* La. R.S. 9:5829(A). In *American Global Insurance Co.*, 2020-0438, p.3, __ So.3d at __, 2021 WL 1399742 at *2, this Court determined La. R.S. 9:5829 was clear and unambiguous. "All deadlines were subject to a 'limited

---

[49] 30 JBE 2020, 84 JBE 2020.

suspension or extension until July 6, 2020.' Thus, any deadline that would have expired between March 17, 2020 and July 5, 2020, expired July 6, 2020[.]" *Id.*

The Supreme Court ordered that all civil trials, hearings, and court appearances were continued and would be re-set.[50] The Supreme Court's orders did not address other legal deadlines such as the opt-out, object, or opt-in deadlines at issue herein.

Appellants contend a potential member of the class might receive mail at a business address or post office box and did not receive the notice due to the public being told to stay home. HBPA mailed the notices on February 27, 2020. Presumably, most members received the notice prior to the Governor's March 22, 2020 Proclamation issuing a general stay-at-home order.[51] Moreover, Appellants' argument that a member would have believed the deadlines were set aside relies purely on conjecture. Notably, Appellants themselves did not believe the Governor's Proclamations or the Supreme Court's orders vacated the deadlines in the notice because they filed their own objections in the time set forth in the notice.

Appellants also submit HBPA mailed a notice of the new fairness hearing to the members of the class, adding to the confusion. They continue to rely on conjecture to support their argument. Again, Appellants themselves were not confused as they appeared and testified at the fairness hearing. They also presented no evidence that a single class member was confused by the notice of the new date of the fairness hearing.

Appellants aver if Mr. Roberts, a class representative, was unsure of how to handle his claim form, then other members of the class could not be expected to

---

[50] La. Sup. Ct. orders dated March 16, 2020 and March 20, 2020.
[51] *See* 33 JBE 2020.

know how to proceed. A review of Mr. Roberts' testimony does not support Appellants' contention. Class counsel questioned Mr. Roberts as follows:

Q. Did you intend to submit a claim form?

A. I intended and I kind of felt during the pandemic, if I mailed or I didn't mail it, it really - -

Q. You're not sure - -

A. - - I'm not sure, I'm going to be honest to you. I - - I just - - I'm really not sure.

In this instance, Mr. Roberts did not express he did not know how to handle his claim form. Rather, he testified he was not the sure if he mailed the claim form during the pandemic. This assignment lacks merit.

***Issue (E) - The Class Representatives Failed to Fairly and Adequately Protect the Interests of the Class and Did Not Have Claims Typical of the Class as a Whole***

Appellants note Mr. Roberts is a trainer and Mrs. Foreman is an owner. They contend Mr. Roberts and Mrs. Foreman did not file claims timely and did not protect their own interests. Thus, Appellants conclude Mr. Roberts and Mrs. Foreman could not protect the interests of the class.

Additionally, Appellants note the class consists of owners, trainers, and jockeys. They argue the jockey representatives, Mr. Lavergne and Mr. Hamilton, no longer supported the proposed settlement agreement. Thus, Appellants contend Mr. Roberts and Mrs. Foreman could not protect the interests of the jockeys. Further, Appellants submit Mr. Roberts and Mrs. Foreman could not protect the interests of retired jockeys such as Mr. Brossette.

In their brief to this Court, Fair Grounds Defendants aver that Appellants provided no support for the claim that a jockey needed to represent the class

members who are jockeys. Fair Grounds Defendants cite *Duhon v. Harbor Homeowners' Ass'n, Inc.*, 2015-0852 (La. App. 4 Cir. 6/30/16), 197 So.3d 322. Class representatives are considered adequate if "the claims of the proposed class representatives [are] a cross-section of, or typical of, the claims of all class members." *Duhon*, 2015-0852, p. 9, 197 So.3d at 329. Fair Grounds Defendants contend that Appellants failed to submit evidence to support the claim that the interests of the jockeys are distinct from the rest of the class. Rather, Fair Grounds Defendants again submit owners inherently represent jockeys because of how the jockeys are paid.

In their response, Class Representatives aver one of every type of person in the class is not required to serve as a representative, citing *Andrews v. Trans Union Corp.*, 2004-2158, p.6 (La. App. 4 Cir. 8/17/05), 917 So.2d 463, 468. Rather, the claims of the representatives "must be a cross section of, or typical of the claims of the other class members." *Andrews*, p.6, 2004-2158, 917 So.2d at 468.

Additionally, Class Representatives assert Mr. Roberts and Mrs. Foreman both have past due claims and future claims under the legal theories applicable to all claimants. Thus, they contend the claims of Mr. Roberts and Mrs. Foreman are typical of the claims of the other class members.

Further, while noting there is no requirement that a class representative file a claim form, Class Representatives aver the evidence revealed Mrs. Foreman filed her claim form timely and Mr. Roberts' partnerships filed claim forms timely. Thus, Class Representatives contend Appellants misconstrue Mr. Roberts' testimony regarding his individual claim form. They submit Mr. Robert's testimony reveals he could not remember whether he had filed his claim but did recall the partnerships filed claims.

119

We note that to certify a class, the trial court must find that the representative parties will fairly and adequately protect the interests of the class. La. C.C.P. art. 591(A)(4).[52] "Adequacy of representation for class certification requires that the claims of the proposed class representatives be a cross-section of, or typical of, the claims of all class members." *Duhon,* 2015-0852, p.9, 197 So.3d at 329 (*quoting Husband v. Tenet Health Sys. Med. Ctr., Inc.*, 2008-1257, p.11, (La. App. 4 Cir. 8/12/09), 16 So.3d 1220, 1230). The plaintiffs do not have to produce an individual representing every type of claim. *Andrews v. Trans Union Corp.*, 2004-2158, p.6 (La. App. 4 Cir. 8/17/05), 917 So.2d 463, 468.

In *Duhon*, this Court acknowledged four factors are relevant to this inquiry, namely:

(1) The representative must be able to demonstrate that he or she suffered an actual injury;

(2) The representative should possess firsthand knowledge or experience of the conduct at issue in the litigation;

(3) The representative's stake in the litigation, that is, the substantiality of his or her interest in winning the lawsuit, should be significant enough, relative to that of other class members, to ensure that representative's conscientious participation in the litigation; and

(4) The representative should not have interests antagonistic to or in direct conflict with those of other class members.

*Duhon*, 2015-0852, p.9, 197 So.3d at 329 (*Claborne*, 2014–1050, pp. 14-15, 165 So.3d at 282).

---

[52] La. C.C.P. art. 591 provides five prerequisites that must be met to qualify for class certification: (1) numerosity; (2) commonality; (3) typicality; (4) adequacy of representation; and (5) objectively defined class. The appellants do not challenge the trial court's finding that the class representatives met the other four prerequisites for class certification. Nonetheless, a review of the record finds the trial court did not abuse its discretion in certifying the class as the evidence supports a finding of numerosity, commonality, and typicality. Further, the judgment objectively defines the class.

Mr. Roberts and Mrs. Foreman demonstrated they suffered an actual injury. Mr. Roberts, through his partnership, and Mrs. Foreman, individually, both submitted claim forms for past due claims. They both spoke of the benefit additional race days and purse funds provide to quarter-horse racing for the future. They demonstrated knowledge and experience of the conduct at issue in the litigation, the failure to pay video poker purse funds to quarter-horse races. The interests of Mr. Roberts and Mrs. Foreman in the litigation are significant, and they conscientiously participated in the litigation by attending meetings, Commission hearings, and court hearings. Their interests are not antagonistic to or in direct conflict with those of the other class members. In this instance, the Fair Grounds offers a single purse per race. From that purse, the winning owners, trainers, and jockeys receive a set percentage. Thus, the higher the purse, the more money each owner, trainer, and jockey is entitled to according to the set percentage.

Mr. Brossette asserted future race dates and purses do not benefit him because he is retired from racing. However, Mr. Brossette did not submit a claim form to participate in the past due claims, did not present evidence to support his contention he should be paid more money for past due claims, and did not opt-out of the settlement.

The trial court determined Mr. Roberts and Mrs. Foreman fairly and adequately represented the class. Considering the *Duhon* factors, the trial court did not abuse its discretion in finding Mr. Roberts and Mrs. Foreman fairly and adequately represented the class. This assignment is without merit.

***Issue (F) - The Trial Court Erred in Approving the Proposed Settlement Agreement When Soileau Plaintiffs Filed a Second Amended Petition***

Appellants next aver Soileau Plaintiffs possessed authority to file the Second Amended Petition. They contend neither Fair Grounds Defendants nor HBPA filed an answer and the court did not certify a class pursuant to La. C.C.P. art. 592. Thus, Appellants conclude that Soileau Plaintiffs possessed procedural capacity to file the Second Amended Petition.

Additionally, Appellants argue they cannot be forced to opt-out of their own case without due process. In this regard, Appellants aver they were not served with the joint motion that excluded them from being class representatives and they were never provided with new dates to object, opt-out, or opt-in. Further, Appellants note they filed a motion for clarification requesting the court continue all deadlines. They again insist the Governor's Proclamations and Supreme Court's orders continued the dates to object, opt-out, and opt-in.

In their response, Fair Grounds Defendants contend the Code of Civil Procedure includes articles on class action lawsuits and the settlement of such lawsuits, citing La. C.C.P. arts. 591-597. If members of the class do not wish to participate in the settlement but wish to continue with the lawsuit, the members opt-out of the settlement. Fair Grounds Defendants aver Appellants elected not to opt-out of the settlement. They argue that to allow objecting members of the class to proceed with an identical class action petition/proceeding would turn Louisiana's class action settlement law on its head.

Class Representatives note the trial court denied Appellants' attempt to take over the class by the filing of the Second Amended Petition naming the exact same class. The trial court granted the exceptions filed by Fair Grounds Defendants and

HBPA. Class Representatives also note that Appellants filed an application for supervisory writs and this Court issued a writ denial, stating the trial court did not err.

In support of their argument, Class Representatives point to their opposition to the application for supervisory writs. Therein, they noted that Appellants possessed the opportunity to opt-out but did not. Class Representatives contended that Appellants could have opted out and possessed the right to file amended claims in their individual capacity. Instead, Appellants elected to file objections to the proposed settlement agreement. Class Representatives asserted that Appellants had no right to amend the petition on behalf of the class to void the court-approved proposed settlement agreement.

We note that Appellants filed a Second Amended Petition after the trial court certified the class for settlement purposes. It sought to certify an identical class with the exact claims seeking the same damages, but to have the court appoint Appellants as class representatives. After the filing of the Second Amended Petition, Appellees filed exceptions of lack of procedural capacity, prematurity, and *lis pendens*.[53] The trial court granted the exceptions and dismissed the Second Amended Petition. Appellants sought review and this Court denied the application for supervisory writs "as the trial court did not err."

Nonetheless, the "denial of supervisory writs does not bar . . . reconsideration of the same issue argued in the writ application when an appeal is taken from a final judgment." *Guilbeaux v. Lupo Enterprises, L.L.C.*, 2021-0053, pp.7-8 (La. App. 4 Cir. 5/19/21), __ So.3d __, 2021 WL 1997293 (quoting *Lake*

_____

[53] Appellants do not contest the trial court's grant of the exceptions of prematurity and *lis pendens*.

*Air Capital II, L.L.C. v. Perera*, 2015-0037, p.8 (La. App. 4 Cir. 5/13/15), 172 So.3d 84, 88). Thus, the merits of the argument will be addressed.

This Court discussed the exception of lack of procedural capacity in *Rain CII Carbon, L.L.C. v. Recon Eng'g, Inc.*, 2018-0916, p.4 (La. App. 4 Cir. 5/1/19), 270 So.3d 785, 788. Therein, this Court explained that appellate courts apply the *de novo* standard of review to a trial court's ruling on the dilatory exception of procedural capacity. *Id.* This Court further indicated:

> [t]he dilatory exception of lack of procedural capacity raises the issue of want of capacity of the plaintiff to institute and prosecute the action and stand in judgment, and/or challenges the authority of a plaintiff who appears in a purely representative capacity." *English Turn.* [*Prop. Owners Ass'n v. Taranto*, 2016-0319], p.6, 219 So.3d [381,] 387. *See also Harvey v. State*, 2014-0156, p.12 (La. App. 4 Cir. 12/16/15), 183 So.3d 684, 695, *writ denied*, 2016-0105 (La. 3/4/16), 188 So.3d 1060. The exception "tests a party's legal capacity to bring suit." *Mt. Zion Baptist Ass'n v. Mt. Zion Baptist Church # 1 of Revilletown Park*, 2016-0151, p.5 (La. App. 1 Cir. 10/31/16), 207 So.3d 414, 417, *writ denied*, 2016-2109 (La. 2/3/17), 215 So.3d 697.

*Rain CII Carbon, L.L.C.*, 2018-0916, p.4, 270 So.3d at 788.

A class action suit is "a lawsuit in which the court authorizes a single person or a small group of people to represent the interests of a larger group." BLACK'S LAW DICTIONARY 284 (9th ed. 2009). Louisiana Code of Civil Procedure Articles 591 - 597 specifically govern class action lawsuits. One of the purposes of class action proceedings is to avoid the risk of "[i]nconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." La. C.C.P. art. 591(B)(1)(a). After appointment, class representatives are to represent absent class members. *See Claborne,* 2014-1050, p.14, 165 So.3d at 282 (where this Court acknowledged class representatives are to fairly and adequately represent the class).

124

Another purpose of class action lawsuits is to advance the efficiency and economy of multi-party litigation. *Lightfoot v. District of Columbia.*, 233 F.R.D. 28, 30 (D.D.C. 2006). "[T]he class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion under Rule 23." *Lightfoot*, 233 F.R.D. at 30 (*quoting Chang v. United States*, 217 F.R.D. 262, 268 (D.D.C. 2003).

The courts have long noted there is overriding public interest in favor of settlement of class action lawsuits. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). Additionally, one author noted:

> Class action settlements offer obvious benefits to litigants and courts alike by providing a valuable mechanism for disposing of massive lawsuits that threaten to usurp huge amounts of resources and time. At the same time, such settlements afford the members of plaintiffs' classes with certainty in their recovery, while simultaneously providing class action defendants with the benefits of *res judicata* extended across an entire class of potential claimants.

Kent A. Lambert, *Class Action Settlements in Louisiana*, 61 LA. L. REV. 89, 89 (2000) (footnotes omitted).

Interpreting the class action procedural law in the manner suggested by Appellants would result in chaos in class action proceedings. While the trial court first certified the class for settlement purposes, allowing the filing of the Second Amended Petition would have resulted in the voidance of the proposed settlement agreement; the usurpation of Mr. Roberts and Mrs. Foreman as class representatives without the filing of a formal motion to remove class representatives; the usurpation of class counsel without the filing of a formal motion to remove class counsel; and the disbandment of the settlement class. Allowing Appellants to file the Second Amended Petition would also result in potentially inconsistent adjudications, waste resources, result in confusion within

the class because the class received notice of the settlement, and destroy the certainty of the proposed settlement agreement. Appellants' interpretation would result in a disservice to the very purposes of class action proceedings. Thus, Appellants lack capacity to act on behalf of the existing class. Concluding otherwise would allow Appellants to hold the remaining class members hostage. *See, e.g., Parker,* 667 F.2d at 1211 ("the named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement"). The law provided Appellants with the right to opt-out of the settlement and proceed with their claims individually, and to file amended petitions pertaining to their individual claims. Instead, Appellants elected to object to the proposed settlement agreement. They possessed no authority to file the Second Amended Petition with respect to the class. A *de novo* review reveals the trial court did not err in granting the exception and dismissing the Second Amended Petition. This assignment lacks merit.

### Issue (G) - The Settlement Agreement is Void "Ab Initio" by Its Own Terms

Appellants aver the trial court erred in approving the proposed settlement agreement because it is void by its own terms. Appellants note the proposed settlement agreement provides for an opt-out threshold of $50,000.00. Thus, if the claims of the class members who opt-out totals more than $50,000.00, the proposed settlement agreement is void unless otherwise stipulated in writing. Appellants argue their claims total more than $50,000.00. Thus, Appellants conclude the proposed settlement agreement is void.

In their brief to this Court, Fair Grounds Defendants aver there is no support for Appellants' contention they met the opt-out threshold. Fair Grounds

126

Defendants contend that Appellants did not opt-out of the settlement. Instead of opting out, Appellants elected to file objections to the settlement.

Similarly, Class Representatives argue that Appellants mislead the court by contending their claims exceed $50,000.00 and that the proposed settlement agreement is thus void. Class Representatives aver the proposed settlement agreement provides that if the value of the claims of the members opting out reaches $50,000.00, the proposed settlement agreement is void unless otherwise provided in writing. Class Representatives contend that Appellants did not opt-out. Thus, the value of their claims is immaterial. Class Representatives note the testimony and evidence reveal one class member submitted a valid opt-out form and the value did not reach $50,000.00.

In reviewing the proposed settlement agreement, we note it provides that if the value of the claims of the members who opt-out reaches $50,000.00, the agreement is void *ab initio*. Appellants contend the claim of Mr. Brossette is $36,765.00 and that of Mr. Dehart is $29,804.93. Accordingly, Appellants conclude the threshold amount was thus met. However, this argument is misplaced. Mr. Brossette and Mr. Dehart did not opt-out. Rather, they submitted objections to the proposed settlement agreement. The notice provided specific instructions on submitting a claim form, an objection, and opting out. The notice detailed the difference between the choices. No law or jurisprudence allows Appellants the opportunity to change their mind and convert an objection into an opt-out form. Appellants' argument lacks legal and factual support and is without merit.

Our review of the record reveals the proposed settlement agreement is fair, reasonable, and adequate. Thus, the trial court did not abuse its discretion in granting final approval of the proposed settlement agreement.

**DECREE**

For the foregoing reasons, the trial court's judgments denying the motions to vacate (2021-CA-0022), granting preliminary approval of the proposed settlement agreement (2021-CA-0049), and granting final approval of the proposed settlement agreement (2021-CA-0199) are affirmed.

**AFFIRMED**